## CHILDS *v.* STATE.

### Opinion delivered March 27, 1911.

1. EVIDENCE—RES GESTAE.—It was not error, in a murder case, to permit the State to prove that defendant's brother struck decedent immediately after he was fatally shot by defendant, where there was testimony tending to prove that defendant and his brother were acting together in assaulting decedent. (Page 435.)

2. SAME—RES GESTAE.—It was not error, in a murder case, to permit the State to prove as part of *res gestae* that defendant's brother struck decedent over the head with a breast yoke immediately after defendant shot him and that one of defendant's shots struck an innocent bystander. (Page 436.)

3. HOMICIDE—BURDEN OF PROOF.—It was not error in a murder case to refuse to instruct the jury that the State must prove beyond a reasonable doubt that the defendant did not kill the deceased in the exercise of self-defense. (Page 436.)

4. SAME—BURDEN OF PROOF.—Under Kirby's Digest, § 1765, providing that when a killing has been proved the burden of proving circumstances of mitigation that will justify or excuse the killing devolves on the defendant, *held* that upon proof of a killing by defendant the burden is on him to show facts to justify or excuse the killing, but it is sufficient if the evidence raises a reasonable doubt of his guilt. (Page 436.)

Appeal from Union Circuit Court; *George W. Hayes,* Judge; affirmed.

*Marsh & Flenniken, Pat McNally* and *Bradshaw, Rhoton & Helm,* for appellant.

1. The punishment is excessive. 76 Ark. 515, 520.

2. It was error to refuse to give instruction No. 5 asked by defendant, and in modifying it. It was the duty of the State

to prove beyond a reasonable doubt that defendant did not kill in self-defense. The burden was on the prosecution.

3. The court erred in admitting testimony as to the action of Seth Childs, and in permitting P. Price to testify to substantially the same facts. Also in permitting testimony as to the shooting of Smith, which was purely accidental.

4. The indictment should have been quashed. Kirby's Digest, § 4519.

*Hal L. Norwood,* Attorney General; *Wm. H. Rector,* assistant, for appellee.

1. The punishment is not excessive. We think defendant was lucky in escaping the halter.

2. It was not error to refuse instruction No. 5. The court properly modified it. The State is not called on to prove a negative. Self-defense must be proved by the defendant. Kirby's Digest, § 1765; 76 Ark. 110; 76 Ark. 515.

3. There was no error in the court's rulings as to admitting testimony. 77 Ark. 444.

4. The motion to quash was properly overruled. The excuse of a juryman is a matter addressed to the sound discretion of the judge. Kirby's Digest, § 4519.

HART, J. Dave Childs was indicted for the crime of murder in the first degree, charged to have been committed by killing Franklin Williams. Upon a trial before a jury, he was convicted of murder in the second degree and sentenced to a term of ten years in the State penitentiary.

Franklin Williams was killed by Dave Childs on August 27, 1910, at a public speaking at Midway Church in Union County, Arkansas. Williams was the husband of Callie Williams, a sister of Childs. They had been married 20 years; but had separated on the 20th of September, 1909. A suit for divorce, which also involved the custody of their children, was pending at the time of the killing. Williams' wife had charged him with cruelly beating her before their separation. It seems that all these matters had caused bad blood between Childs and Williams. On the day of the killing Franklin Williams and M. D. Smith, a justice of the peace, passed the wagon of Dave Childs. The manner of the killing and the circumstances connected therewith, as testified to by Smith, may be briefly stated as follows:

Williams said: "Dave, I wish you would let my children alone." And the latter replied: "I think Callie ought to have the right to have her children part of the time." That was about all of that conversation, and Williams and Smith passed on. Childs stayed at his wagon, where he was feeding his horses. In a few minutes Williams and Smith returned going in the direction of the speaking. As they passed Childs' wagon, he said to Williams: "Your boy has been here two or three times for a nickel to buy candy and lemonade." Williams said: "Do not let him have it." Dave Childs then asked Smith if there was any law to keep Callie from having her children part of the time, and Smith answered that he knew no such law. About this time, Scott Childs, the brother of the defendant, Dave Childs, began to curse and abuse Williams, whereupon the latter with an oath said: "If nothing but trouble will do, I can give it to you." Smith commanded the peace. Then he and Williams started away. After they had walked away two or three steps, Dave Childs commenced firing a pistol at Williams. He fired two shots, hitting him both times. The next shot hit Smith. Childs then fired two more shots.

On cross examination, Smith stated that when Williams said: "If nothing but trouble will do, I can give it to you," he just stood there rubbing his hands together. Just prior to this, he had been advancing toward Dave and Scott Childs, and when he made the remark was within three feet of Scott Childs and four or five feet from the defendant, and was standing facing them both. Smith said that Scott Childs had a knife in his hand; and that he (Smith) was trying to keep the deceased from advancing on Scott Childs. That deceased had stepped back one step and, starting to leave, had taken two or three steps toward the crowd before the shooting began.

On re-direct examination, over the objection of defendant, Smith was permitted to state that Scott Childs, the brother of defendant, grabbed the breast yoke of the wagon and struck deceased over the head two licks with it immediately after defendant shot him. Smith also stated that he did not see any pistol in the hands of deceased.

Dr. J. A. Moore, witness for the State, testified as follows: That he lives at Lisbon, Arkansas; was a practicing physi-

cian and surgeon, and had been for twelve years; knew the deceased in his lifetime; that he was at Midway the day the deceased was killed, and was called on to make a *post mortem* examination, and that he did so; he found the top bullet entered the body in front of the right shoulder; passed the collar bone between the first and second ribs, ranged to the left, passing through the lung came out on the left side in front of and below the shoulder. The next bullet passed through his left arm below the elbow. The next one entered between the eleventh and twelfth rib about three inches to the right of the spine, ranging to the left, passing through the kidney and liver and the lower part of the heart, and came out between the fifth and sixth ribs. The next one entered in about an inch of the one just referred to, passing below the twelfth rib, ranging to the left, and this one struck the spinal process of the first lumbar vertebrae and glanced behind the spine. "Any one of the three of these shots would have produced death, and I think that the one that passed through the kidneys and heart would have produced instant death."

Another witness for the State testified that when deceased's body was turned over, his pistol, which was already partly out of his scabbard, fell from it. Other witnesses for the State testified that the pistol of deceased was out of the scabbard and was lying near his body when it was turned over. They also state that deceased had turned and started to walk away when defendant shot him.

Dave Childs, the defendant, testified that at the time the difficulty took place I was feeding my team; after I went to my wagon I saw Franklin Williams, the deceased, and Mr. Smith come by, and they went up the road. As they went up, Franklin Williams said to me: "I want you to leave my children alone," and I replied: "I am not bothering your children." They went on up the road.

"The next time I saw him he was coming back down the road. While he was up the road, his little boy came down to the wagon. I saw him coming down the road, and told him his child had been there again for money, and he told me not to let him have it. I asked Mr. Smith if there was any law to keep Callie from being with her children at a public gathering like

this, and he said that he did not know there was any. After I spoke to Mr. Smith mentioning my sister, Williams made towards me. He had something in his right hand down at his side, and I took it to be a knife, and I said to him: "Back up; back up." He didn't just then. I reached over in my wagon after a pistol, and by that time he had his pistol drawn on me, and I shot just as quick as I could. I shot to save my life. I really believed if I did not shoot I would be killed. When I fired the first shot, his right side was towards me. As he walked up, he said: "If trouble is what you are expecting, you can get it." I started to get my pistol the moment I saw something in his hand.

"When I reached for my pistol, I thought he was coming on me with a knife. When I told him to back up, he backed up a step and threw his gun like this. I realized it was a pistol, and shot as quick as I could. I do not know where the first shot hit him, but it was somewhere about his right side. There was smoke in my face, and I could not tell. He careened down and threw his right side to me. It took not more than half a second to fire these shots. I knew at this time that he had made threats against me. I knew the threats he had made to Sam Vinson against me. He was a large, tall, rawboned man.

"The pistol I had was taken away from me by the officers. I have no opportunity to present it here. It is a double action pistol. I had never seen an automatic pistol."

Scott Childs corroborated the testimony of the defendant. He admitted calling deceased a vile name, but said that it was after Williams had called him one.

The defendant also adduced evidence tending to show that deceased was a turbulent, quarrelsome and overbearing man; and that he had previously made threats against the life of the defendant, and that these threats had been communicated. To rebut this, the State introduced evidence tending to show that deceased had the reputation of being a quiet, peaceful and law-abiding citizen.

It is first earnestly insisted by counsel for defendant that the punishment is excessive, and they ask that it be reduced. They rely upon the case of *Petty* v. *State*, 76 Ark. 515, where this court reduced the punishment from 15 to 5 years. There, as in this case, the jury found the defendant guilty of murder in

the second degree, and the court held that, there being a conflict
of evidence, the finding of the jury as to the grade of the offense
must stand. We think a comparison of the facts and circum-
stances in the two cases are not in defendant's favor. In the
Petty case the killing was the result of a sudden quarrel, and was
done "under the heat of passion caused by very provoking lan-
guage" on the part of the deceased. Here, according to the
testimony of the witnesses for the State, the deceased was walk-
ing away when the defendant shot him. Conceding that he had
his pistol in his hand as testified to by defendant and his brother,
it is evident that he was making no attempt to use it; for defend-
ant reached into his wagon, took his pistol from a satchel and
fired at deceased four times without his fire being returned. If
deceased was armed with an automatic pistol, and had it in his
hand, it seem incredible that he did not fire it if he was endeav-
oring to kill the defendant. We think the facts and circumstances
adduced in evidence in the case at bar show a more aggravated
case of homicide than those disclosed by the record in the Petty
case, and are of the opinion that they do not justify us in reduc-
ing the punishment.

We are next urged to reverse the judgment of conviction
on account of the alleged error in admitting testimony to the
effect that Scott Childs, the brother of defendant, struck deceased
over the head with the breast yoke of the wagon immediately
after the deceased had been shot. The testimony was competent.
There was sufficient evidence, we think, to justify the conclusion
that defendant and his brother were acting together in making
the assault upon deceased. Besides, the evidence was a part of
the *res gestae,* and it was necessary to make this proof to fully
and correctly detail and set out the facts of the assault. The
defendant's brother was present the whole time, and struck de-
ceased as soon as the defendant ceased shooting him. It was
all a part of one transaction, and it would be difficult to give a
connected and correct account of the occurrence without stating
all that was said and done concerning it. Under the law all that
occurred at the time and place of the shooting which had refer-
ence thereto or connection therewith was part of the *res gestae.*
*Byrd* v. *State,* 69 Ark. 537. "*Res gestae* are the surrounding

facts of a transaction, explanatory of an act, or showing a motive for acting." *Carr* v. *State,* 43 Ark. 99.

It is also insisted that the testimony showing that one of the shots struck Smith was incompetent and prejudicial. What we have already said we think disposes of this objection.

Moreover, Smith was shot accidentally because he was between defendant and deceased, and it is not claimed that he in any way participated in the quarrel or subsequent assault. Hence it is apparent that no prejudice could have resulted from this testimony. It was a part of the proof showing the manner and circumstances connected with the shooting.

It is next insisted that the court erred in modifying the following instruction asked by defendant:

"5. You have been told that, the killing being proved, the burden of proving circumstances of mitigation or justification is on the defendant. This does not, however, mean that the burden is on the defendant to show that he killed the deceased in self-defense. Before a conviction can be had in this case the State must prove beyond a reasonable doubt that the defendant did not kill the deceased in the exercise of self-defense; but if after a careful consideration and comparison of the evidence and the circumstances in the whole case you have a reasonable doubt as to whether or not the defendant killed deceased in self defense, you should find the defendant not guilty."

The court modified it so as to read as follows:

"You are told that, the killing being proved, the the burden of proving circumstances of mitigation or justification is on the defendant, but if, after careful consideration and comparison of the evidence and circumstances in the whole case, you have a reasonable doubt as to whether or not defendant killed deceased in self defense, you should find defendant not guilty."

It was not error to refuse the instruction in the form requested by the defendant. It is not sound law wherein it puts the burden on the State of negativing beyond a reasonable doubt defensive matter.

The instruction as modified was correct. It was based upon section 1765 of Kirby's Digest. This section was given to the jury and reads as follows:

"VI. The court tells the jury that, the killing being proved,

then the burden of proving circumstances of mitigation that will justify or excuse the killing devolves on the defendant, unless by proof on the part of the State it is manifest that the offense amounts only to manslaughter, or that the accused was justified or excused in committing the homicide; provided the burden of the whole case is on the State to show that the defendant is guilty beyond a reasonable doubt."

It was proved that the defendant killed Franklin Williams. The burden was then on the defendant to show facts to justify or excuse the killing. In doing this he is entitled to receive the benefit of all the evidence in the case. It is sufficient if the evidence raises a reasonable doubt as to the defense he advances. The jury were also instructed that if there was a reasonable doubt on the whole case it must acquit. *Cogburn* v. *State,* 76 Ark. 110; *Petty* v. *State,* 76 Ark. 515.

The judgment will be affirmed.