TURNAGE *v.* STATE.

Opinion delivered July 7, 1930.

*J. H. Carmichael, Jr.*, and *H. B. Stubblefield*, for appellant.

*Hal L. Norwood*, Attorney General, and *Robert F. Smith*, Assistant, for appellee.

HART, C. J. James Turnage prosecutes this appeal to reverse a judgment of conviction for the crime of murder in the first degree.

The first assignment of error is that the court erred in not sustaining a demurrer to the indictment. The rec-

ord shows that George Washington, James Turnage and Lindsey Turnage were indicted for the crime of murder in the first degree charged to have been committed by killing William H. Roberts while engaged in an attempt to rob him. The contention of counsel is based on the allegations of the indictment using the word "intent" instead of the word "attempt" to rob W. H. Roberts. The record shows that this assignment of error was decided adversely against this contention in the case of *Washington* v. *State,* 181 Ark. 1011, 28 S. W. (2d) 1055. This is a companion case to that, and, inasmuch as the indictment is set out in full in the Washington case, we do not deem it necessary to repeat it here. We there held that in crimes which required force as an element in their commission, such as robbery, there is no substantial difference between an assault with intent and an assault with attempt to commit the offense. What we there said is conclusive against the position now taken by counsel for the defendant. In addition, it may be said that the indictment charged that the defendant "with a felonious intent then and there to rob William H. Roberts did assault, kill and murder the said William H. Roberts with a certain pistol loaded with gun powder and bullets" *et cetera.* This, in plain language, charges the defendants with killing Roberts while attempting to rob him, and no one could have been misled by the language used. It is of itself a substantial compliance with the language of § 2343 of Crawford & Moses' Digest under which the defendants were indicted.

It is next insisted that the court erred in refusing to require the State to elect whether it would try the defendant for murder committed under the provisions of § 2343 of the Digest, or for murder as otherwise defined by the statute. We do not think there is any merit in this contention. The record shows that the defendant was tried for murder charged to have been committed under § 2343 of the Digest, that is to say, for murder committed while in the attempt to perpetrate robbery. All of the evidence introduced by the State and all the

instructions given by the court unmistakably point to this fact, and counsel for the defendant could not have been misled in the premises.

The most important assignment of error relates to the legal sufficiency of the evidence to support a verdict of guilty of murder in the first degree and the fixing of the death penalty therefor by the jury. A proper consideration of this question necessitates giving a full outline of the circumstances leading up to, and including, the commission of the crime. According to the testimony of Mrs. William H. Roberts, wife of the deceased, her husband was shot on the night of December 7, 1929, at their filling station on the Galloway Pike about three miles east of North Little Rock in Pulaski County, Arkansas, and died shortly afterwards from the wounds received. Just before he was shot, he was sitting in the filling station with witness and C. J. Gordon. Witness looked out of the front window and saw three negroes go from the front down the side of the building toward the rear of the building. Witness told her husband to go into the back room and see what they wanted. Roberts walked into the back room and witness heard two shots fired and immediately after that five more shots. The first two shots were not so loud as the last five. Witness' husband came in at the front door with his gun in his hand.

Other evidence tended to show that Roberts was shot by George Washington, and that the gun used was smaller caliber than that of Roberts. A. R. Lamb, a deputy sheriff, testified that at the time the defendant was arrested for the murder of W. H. Roberts he had a thirty-eight Special Smith & Wesson pistol under his pillow which was loaded —this was the next night after the killing. Witness talked to the defendant that night, and the defendant first denied knowing anything about the killing. Finally he told the witness that, if the rest of them had told it, he would tell it too, and stated that they (meaning George Washington and his brother, Lindsey Turnage, and himself) went up to the filling station where Roberts was

killed. They stopped the car before they got to the filling station. Defendant first pretended not to know what they went for. Witness asked the defendant what they were going up there for and he said that they were going up there to rob the filling station; that is, he said that one of the others told him that they were going up there to rob the filling station. After the killing occurred officers examined a field near the filling station and found tracks in it going from the station which fitted the feet of James and Lindsey Turnage. Another officer testified that the defendant admitted to him that he had a sweat rag under his hat and that George Washington and Lindsey Turnage each had a rag, or loosely fitting handkerchief, around his neck.

According to the testimony of George Washington, he was twenty-nine years old, and had been tried and convicted for killing W. H. Roberts; that he, in company with James and Lindsey Turnage, got out of their car and went around Robert's filling station toward the back of the building; that they passed by the front window and went around toward the back. When they got around to the back Roberts came to the door and shoved it open. Just as he shoved it open James Turnage said, ''Look out, Lindsey,'' and witness was shot. The witness admitted that he then shot at Roberts. James and Lindsey Turnage ran off when the shooting commenced. Witness testified that he had his pistol in his raincoat and that James and Lindsey Turnage each had a pistol in a holster attached to his belt.

The confession of the defendant was also introduced in evidence and in it the defendant stated that George Washington had told them on the way up there that they were going to rob the filling station. According to the testimony of the defendant, he left just as soon as he saw George Washington going towards the rear of the filling station and never had any intention of helping him rob it. The testimony shows that Lindsey Turnage was about eighteen years of age and that James Turnage was twenty-eight years old.

In testing the legal sufficiency of the evidence to support the verdict it must be viewed in the light most favorable to the State. As we have already seen, the indictment was found under § 2343 of the Digest and charges the defendant with murder committed while attempting to perpetrate robbery. An attempt, in general, is an overt act to do a specific thing; it must be something tending to accomplish the end, but falling short of committing it. Here the jury was warranted in finding something more than an intent and preparation to commit the crime of robbery. It is true that under the evidence adduced in favor of the defendant he abandoned any attempt to commit the crime of robbery before any overt act was committed by George Washington, but it cannot be said that his testimony is uncontradicted. They went to the filling station in the nighttime, and the wife of the deceased saw them going toward the rear of the building. Each of them had a loose rag or handkerchief tied around his neck which might have been used for a mask. Each of them was armed with a pistol. According to the testimony of the defendant himself, he knew that something wrong was intended when Washington started toward the rear of the building. This showed that the defendant himself was aware that a crime of some sort was about to be committed. While the defendant denies any participation in the crime, Washington testified that he was with him when Roberts opened the door. This shows that the defendant was with Washington at the time that the latter did the shooting. It is true that Washington testified that Roberts shot first, but the jury was also warranted in not believing this to be true. According to the testimony of Mrs. Roberts, the two shots first fired were from a smaller gun than the five shots later fired. The evidence showed that the gun used by Washington was of smaller caliber than that used by Roberts. This was a circumstance tending to show that Washington fired first. The jury doubtless believed that all three of the negroes went to the rear of the filling station, each armed with a pistol

with handkerchiefs around their necks which might be used for masks, for the purpose of entering the filling station from the rear and robbing the proprietor. They happened to be discovered by Mrs. Roberts, who told her husband. He went to the rear door to find out what was the matter and was shot just as he opened the door. He began to fire at the negroes, and they ran away. These facts were plainly inferable from the facts and circumstances proved on behalf of the State and fully warranted the jury in finding that all three of the negroes were present and were preparing to enter the filling station for the purpose of robbing the proprietor, and that this was the beginning of the robbery or the attempted robbery and not merely an act preparatory to committing it. The act of Washington in shooting was in furtherance of the original design to rob the filling station, and, being done in the prosecution of such unlawful design, was murder. It was the natural and probable consequence of it, for which all three must be held accountable. The jury might have found that all three were present, and in the eye of the law the act of Washington, who actually did the shooting, was the act of each. The jury was warranted in finding that each formed the felonious intent of robbing the filling station, and, while all were present, Washington shot Roberts in pursuance of that intention and while carrying it into execution. No matter which one fired first, the killing resulted in homicide and was murder. The transaction had gone beyond intent and preparation and had passed into acts which amounted to an attempt at robbery. See *Henry* v. *State,* 151 Ark. 621, 237 S. W. 454; *Harris* v. *State,* 170 Ark. 1073, 282 S. W. 680; and *Clark* v. *State,* 169 Ark. 717, 276 S. W. 849. Therefore we hold that the evidence was legally sufficient to support the verdict.

The next assignment of error is that the court erred in allowing the coroner to read the statement of the defendant taken at the coroner's inquest. Reliance to sustain this assignment of error is placed upon the case of

*Dunn* v. *State,* 2 Ark. 229. We do not consider this assignment of error well taken. According to the testimony of the coroner the confession in question was not taken during the coroner's inquest, but it was a confession freely and voluntarily made before him by the defendant. No inducement whatever was held out to the defendant to cause him to make the confession. There was no hope of gain or torture of fear or any effort made to compel him to testify at the inquest. The confession was made before the inquest was held, and was freely and voluntarily given. Hence it was admissible on the same ground as if it had been made to the sheriff or anyone else who was investigating the crime. *Bullen* v. *State,* 156 Ark. 148, 245 S. W. 493; and *Sutton* v. *State,* 162 Ark. 438, 258 S. W. 632.

The next assignment of error is that the court erred in allowing C. J. Gordon to testify that when Roberts got back into the filling station and lay down on the bed he was told that Mrs. Roberts had gone to call the ambulance and Roberts remarked that they (meaning the negroes) had gone that way and would hurt his wife. We do not think there was any error in admitting this testimony. It was an incident to what was done immediately after and in connection with the killing, and was admissible as shedding light on the transaction. It would have been difficult to have given a connected account of the killing without stating all that was done and said concerning it at the time. *Childs* v. *State,* 98 Ark. 430, 136 S. W. 285.

The next assignment of error is that the judgment should be reversed because two of the jurors read a lengthy article in the daily paper relating to the homicide. The jury was allowed to separate for the night, and it developed that two of them had read the article in the morning paper. They were admonished by the court that what the newspaper stated was not a record of the court and had no bearing on the case, and they were specially told not to be influenced by the article in any respect. In all of the instructions the court told the jury that they

were the judges of the evidence and to be guided alone by it in arriving at their verdict. Hence we hold that this assignment of error is not well taken.

It is next insisted that the court erred in admitting to the jury the confession of Lindsey Turnage. It will be remembered that James and Lindsey Turnage were jointly indicted and were tried together. The court, several times during the course of the trial, as well as in the instructions given, told the jury that the confessions made by the two brothers could not be used against each other. In plain language the jury was told that what Lindsey Turnage had confessed should not be used against James, and, inasmuch as the testimony in both cases was practically the same, we cannot see how any prejudice whatever could have resulted.

It is next insisted that the court erred in giving instruction No. 8 which reads as follows: "If you find from the evidence that James Turnage, Lindsey Turnage and George Washington conspired together to commit the crime of robbery, and, pursuant to such conspiracy or agreement, the defendants and George Washington went to Wm. H. Roberts' place of business to rob, but further find from the evidence that the defendants, or either of them, abandoned the purpose of such conspiracy or agreement prior to the time of the attempted robbery and also find that George Washington had notice of such abandonment before the attempt to rob was made, then the defendant, or defendants, so abandoning such purpose are not chargeable with the killing of Wm. H. Roberts. And you are instructed that if you find from the evidence that George Washington had notice of such abandonment on the part of the defendants before the attempted robbery, the length of time before is immaterial."

It is insisted that the instruction is erroneous in telling the jury as a matter of law that George Washington, who did the actual shooting, had attempted to rob Wm. H. Roberts. We do not think so. The instruction, when read in its entirety, submits to the jury not only to find whether

there had been a conspiracy to commit the crime of robbery, but also to find whether the purpose of committing the robbery had been abandoned before any attempt had been made to commit it, and also to find whether there had been any attempt on the part of anyone to commit the robbery. In other instructions the court specifically told the jury that it was the judge of the credibility of the witnesses and also of the evidence. We do not think the instruction is erroneous within the rule laid down in *Jones* v. *State,* 59 Ark. 417, 27 S. W. 601, in that the court assumed the existence of any fact and thereby invaded the province of the jury. It did not assume there was an attempt to rob by someone, but left that question to be determined by the jury from the evidence. *Hogue* v. *State,* 93 Ark. 316, 124 S. W. 783. The instructions were full and complete, and presented to the jury every phase of the case. No question was singled out and given undue prominence. No single circumstance was emphasized. The case was tried upon competent evidence, and the rights of the defendant were carefully guarded.

Finally it is insisted that the verdict of the jury should be reduced from the death penalty to that of life imprisonment. There is nothing in the record which would warrant the court in doing so. James and Lindsey Turnage were indicted and tried together; the jury found each guilty of murder in the first degree and fixed the death penalty in the case of James Turnage and life imprisonment in the case of Lindsey Turnage. Presumably this was done because of the youth of Lindsey Turnage, but in any event it was the peculiar province of the jury to fix the punishment in each case, and on appeal this court has no power to reduce it unless for the purpose of eliminating some error committed by the trial court. It follows that the judgment must be affirmed.