SMITH *v.* STATE.

4945                                   324 S. W. 2d 341

Opinion delivered May 25, 1959.

*Ed Trice,* for appellant.

*Bruce Bennett, Atty. General,* by *Bill J. Davis, Asst. Atty. General,* for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Lawrence Smith, was charged by Information with the crime of Murder in the First Degree, it being alleged that Smith murdered Cary C. Cundiff, by shooting him with a .22 caliber rifle, "with premeditation, deliberation, and malice aforethought, and committed in the attempt to and in the perpetration of robbery of the said Cary C. Cundiff." The court appointed reputable counsel for appellant, and pursuant to their motion filed,[1] Smith was committed to the Arkansas State Hospital for Nervous Diseases for observation. In due time, the psychiatric staff of the hospital filed its report, finding Smith to be "without psychosis" and legally responsible at the time of the alleged crime. Smith pleaded guilty to the charge of murder, and the cause was submitted to the jury for their determination of the degree of guilt, and punishment, that should be fixed and adjudged against appellant.[2] The jury returned its verdict, finding Smith guilty of the crime of murder in the first degree, and fixed his punishment at death by electrocution. From the judgment of the court, entered in conformity with the jury's finding, appellant brings this appeal.

There is ample evidence in the record to support the conviction of first degree murder, either as to mur-

---

[1] See Sections 43-1301 and 43-1304, Ark. Stats. (1947) Anno.
[2] Eight witnesses testified, including appellant.

der committed while perpetrating another felony, or murder committed through premeditation and deliberation with malice aforethought. The proof reflected that the deceased was a farmer, who had been plowing in a cotton field. His body was found in the field by his 15 year old son, Charles Cundiff, who had gone to the field to take his father's lunch to him. S. V. Fissell, a mortician at Eudora, testified that in embalming the body, he found six bullet holes, two on the left side of the face, one almost in the center of the head, a penetrating hole on the left side of the head above the hairline, and two in the right leg above the knee. Fissell stated that he probed the bullet hole in the head, and that it went downward into the brain. Two bullets were taken from the body and turned over to officers. S. H. Ball, deputy sheriff and constable, testified that after being notified of the killing, he went to the scene, and found the body of the deceased, lying by his tractor, at the edge of the cotton field; that upon discovering deceased had been shot, he began to look for evidence, and checked up and down the fence row. He located the place where deceased had apparently been plowing, found a lot of blood on top of the cotton, and a number of footprints, "big shoe tracks, run down shoes." After finding the tracks, he, together with two game wardens, went to the home of Smith, who lived about a quarter of a mile from where deceased was found. Smith was in bed asleep, and was awakened by his grandmother. Appellant came out to the porch, and according to Ball:

"* * * as soon as I saw his shoes, I figured he might know something about it, so I had measured this track. I had me a little stick I measured the track with, but I couldn't get up to this house and I left the stick in the car, so I went to the car and got the stick and measured his shoe track and it measured identical with the track in the field where Mr. Cundiff was killed. I started questioning him some and searched him, and found two .22 caliber bullets in his pocket and found two $10 bills, one five and four ones, with blood on them in his pocket. Then I asked him did he kill Mr. Cundiff and he said he did. I asked him what did he do with the gun and he

said he took it back to his grand-daddy's house. Then I arrested him and took him out to Eudora, and Mr. Walton Mathis and me took his confession. * * *''

After taking the confession, Smith was interrogated as to what he did with the pocketbook, and appellant stated that he hid it in the woods back of where he lived. They then drove back out, and Smith took them about 50 yards from the road where the pocketbook, which had belonged to deceased, was found. Ball also testified that the gun was found where Smith told them it was located. The officer testified that most of the details of the killing were related to him at the house, though some were added at the jail. H. B. Routt, a state game warden, who accompanied Ball to the field and house, was present when Smith made his oral confession to Ball, and verified Ball's testimony. Walton Mathis, city marshal of Eudora, testified that he was present when the confession was reduced to writing; that he (Mathis) typed the confession; that no one threatened appellant or mistreated him in any manner, nor was Smith promised any leniency; that appellant was told the confession would likely be used against him. Smith signed all three pages of the confession.

The statement made by Smith related the following pertinent facts . . . that he was 18 years of age . . . had lived with his grandparents since he was one year old . . . his grandfather had promised that he would buy Smith an automobile when he (Smith) got out of the penitentiary in February, 1958,[3] . . . the grandfather told him that he had changed his mind . . . appellant was lying in bed thinking about how he was going to get an automobile . . . got up and went out on the porch and saw Cundiff crossing the field, plowing his cotton with a tractor, and the thought hit him that he could take enough money from Cundiff to get a second-hand car . . . took his grandfather's .22 rifle, which was loaded, and went across the field to where Mr. Cundiff was plowing, and told the latter to give him his money . . . Cundiff told him to ''go on'' . . .

---

[3] Smith had served 6 months in the penitentiary for stealing a watch, and was out on parole at the time he killed Cundiff.

and appellant responded that if Cundiff would give him the money, "It wouldn't be nothing" . . . Cundiff got off the tractor with a hammer in his hand and Smith fired the .22 rifle, striking the farmer . . . Cundiff went behind the tractor and Smith advanced and started shooting as Cundiff was dodging around behind the tractor . . . some of the bullets hit the fender and radiator . . . the gun jammed and Smith ran across a slough . . . Cundiff got back on the tractor and started toward his home, but seeing Smith, cut toward him . . . he cut too short and the wheels slid, and the tractor stopped . . . Cundiff got off the tractor with his billfold in one hand and some money in the other and said "Come and get it" . . . appellant replied, "No, give the billfold to me" . . . 'He said', "I don't want to give you the billfold" . . . Smith then fired and Cundiff fell to the ground, following which appellant walked over, took the money and billfold . . . Cundiff was gasping for breath . . . Smith went back to his house and put the gun in the trunk . . . then went to a thicket back of his house and threw the billfold into it . . . then got his hoe and helped his grandmother hoe . . . he obtained $29 . . . four one dollar bills, two ten dollar bills and one five dollar bill . . . some of the bills and the billfold were blood-stained . . . "I had already noticed blood on the money before they got me, and when they showed it to me, I knew they had the proof on me, and I then told them the truth that it was the money I took from Mr. Cundiff." From the confession:

"I have made this statement realizing that it may be used against me in prosecuting this case against me. I have made it of my own free will and without threat or promise from any one of the officers. I would not have shot Mr. Cundiff if he had given me the money when I ask him for it. * * *"

He stated that after shooting Cundiff the first time, he decided to kill him, so that no one "would know who did it."

On trial, Smith took the witness stand, admitted that he had signed the confession, but when asked why he

killed deceased, replied, "I do not know how come I done it." He stated that the prosecuting attorney had correctly read his confession, and that he remembered all that he had said which had been placed in the confession . . . that he remembered well what happened the day of the slaying and that he knew what was taking place. He stated that, as a small boy, he was hit in the head by a piece of iron, and that "At times I don't know where I am going when I be walking, don't know where I am going. At times I do and at times I don't. * * * When I have the blind staggers, I will be sitting down or lying down, some kind of dark cloud comes over my face. Then if I walks off, I will fall off, and I will later come back to myself." Further: "I will be sitting down and I hear somebody talking to me and I know nobody will be around. Somebody will speak to me and I can't see anything; and I will be sitting down and somebody will talk to me * * *. I will be sitting down and I will hear voices calling my name, be talking, and I couldn't see them. At times I be sitting down and somebody touch me and I couldn't see them." When asked whether he was in possession of his faculties when he killed Mr. Cundiff, the witness replied, "I don't think so. If I had been I wouldn't have did it."

Appellant's motion for new trial contains eight assignments of error, and various objections were made during the trial to the introduction of evidence. The first three assignments deal with sufficiency of the evidence (heretofore discussed). Assignment four cites as error the action of the court in permitting the witness, Steve Ball, to testify in detail about the oral confession made to him by appellant soon after the killing, for the reason that Ball had not advised Smith of his constitutional rights against self-incrimination. We have several times held that the failure to warn or caution the accused that his statement would be used against him does not, of itself, render the confession, or statement made, incompetent. *Greenwood* v. *State,* 107 Ark. 568, 156 S. W. 427, *Dewein* v. *State,* 114 Ark. 472, 170 S. W. 582, *Henry* v. *State,* 151 Ark. 620, 237 S. W. 454.

By assignment No. 5 and objections made during the trial, error is alleged in permitting Ball to testify concerning an additional oral statement made by appellant after Smith's confession had been reduced to writing The additional statement made was explained by Ball in his testimony as follows:

"Q. Did the defendant give you any further information?

A. He did.

Q. Tell the jury what that information was.

A. He told me after we had brought him to Lake Village and put him in jail, I went back to Eudora and went to the funeral home and viewed the body of Mr. Cundiff with the undertaker and this bullet was fired in the head here in the forehead and ranged down, and then I came back to Lake Village and talked to Lawrence again about the shooting, about the shot in the head and the bullet ranged down, and I explained to him, and then he said after he shot him and he fell to the ground, then he walked up behind him and put the gun about this far from his head and shot him in the forehead (indicates about two feet), that he was lying on his back and shot him again."

This Court has held that any voluntary admission that tends to connect a defendant with a crime charged, is admissible. *McMillan* v. *State,* 229 Ark. 249, 314 S. W. 2d 483. The fact that the additional statement was made after the written confession does not make such statement inadmissible. Of course, it was the duty of the jury to determine the degree of the crime, and the above evidence was certainly admissible as tending to show premeditation and deliberation.

It is argued that the court erred in allowing the deceased's hat, bloodstained money, and the .22 caliber rifle to be introduced in evidence, as well as permitting witnesses to testify about the number of shots fired into the body, and the detailed description of the shot fired into Cundiff's head. Counsel contend that this evidence was unnecessary, as appellant had pleaded guilty, and the tes-

timony and exhibits could only serve to inflame the jury. We do not agree. The charge filed by the prosecuting attorney included both murder in the first degree committed after premeditation, deliberation and with malice aforethought, and also murder committed in the perpetration of robbery. All of this evidence was therefore admissible. The rifle and bloodstained money supported the charge of murder committed in the commission of the robbery. The hat (which was still on the head of deceased when the body was found and which had two bullet holes in it), and the testimony complained about, were pertinent facts to be considered in the charge of murder committed with premeditation. In *Rorie* v. *State,* reported in 215 Ark. 282, 220 S. W. 2d 421, appellant was convicted of murder in the first degree and sentenced to death by electrocution. Rorie had been estranged from his wife. ''On the night of October 8, 1948, he went to her home when she was alone with her two small children. When she refused to become reconciled with him, he struck her on the head with a hammer, and either killed her or knocked her unconscious. Then he sprinkled kerosene over the bed where she and her two sleeping children (his step-children) were lying. He set fire to the bed and departed.'' On leaving the premises, Rorie heard the children scream and he observed that the entire house was in flames. Mrs. Rorie and the two children were burned to death, and only skulls and bones remained the morning after the fire. Rorie pleaded guilty, and a jury was impaneled to ascertain the degree of crime, and to fix the punishment. During the trial, various objects were introduced into evidence relating to the crime, including pictures of the victims in wicker baskets, burned beyond recognition, Rorie's bloodstained shirt, and the hammer used in the murder. Appellant objected to the introduction of several different objects introduced as evidence. This Court held such objections to be without merit, and stated: ''The cause was tried to the jury just as though the defendant had pleaded not guilty. Every essential fact of the crime was established. The jury was instructed on the degrees of murder and the discretion as to the punishment.'' It would certainly appear that the exhibits here introduced,

together with the evidence objected to, were plainly relevant to assist the jury in determining the degree of the crime.

By assignment No. 8, appellant cites as error the failure of the court to instruct the jury as to insanity. No request was made for such instruction;[4] in fact, the record reveals that defense counsel stated: ''I would like for the record to show that Mr. Trice and myself have not submitted any instructions for the reason that we feel that the court's instructions adequately cover the case as developed.'' We accordingly find no merit in this contention. See *McCuistion* v. *State,* 213 Ark. 879, 213 S. W. 2d 619, and cases cited therein.

Appellant argues that the record does not reflect that the court specifically instructed the jury that if it found Smith guilty of first degree murder, there was a choice of fixing his punishment at either life imprisonment or death in the electric chair. In *Alford* v. *State,* 223 Ark. 330, 266 S. W. 2d 804, this Court said:

''We think, however, that the court was in error in failing to inform the jury of its option to impose either the death sentence or life imprisonment. Since this option lies entirely with the jury the court is under the affirmative duty of bringing the matter to the jury's attention, even though that action is not requested by the accused. * * * Nor is it shown that, when the forms of verdict were given to the jury by the court, any oral explanation of the forms was made. * * *''

In the case before us, the record reflects, ''Whereupon, after the argument of counsel for the State and the defendant the Court *instructs the jury as to its verdict forms;*''[5] three forms of verdict were then submitted to the jury, as follows:

''1.

We, the jury, find the defendant, Lawrence Smith, guilty of the crime of murder in the first degree, as charged

---

[4] Of course, appellant had pleaded guilty to murder.
[5] Emphasis supplied.

in the information, and fix his punishment at death by electrocution.

......................................................
Foreman

#### 1-A.

We, the jury, find the defendant, Lawrence Smith, guilty of murder in the first degree, as charged in the information, and fix his punishment at life imprisonment in the State Penitenitiary.

......................................................
Foreman

#### 2.

We, the jury, find the defendant, Lawrence Smith, guilty of the crime of murder in the second degree, as charged in the information, and fix his punishment at imprisonment in the State Penitentiary for ......... years.

......................................................
Foreman''

Objection was made to the prosecuting attorney asking Mr. Fissell, the mortician, if he probed for the bullet in the forehead. We think the question was material, in that the answer showed that the bullet ranged downward in the head of the deceased, from the point of entry, which was competent evidence to prove premeditation and deliberation, in that the jury could reasonably believe that Smith was standing over the deceased when he fired that particular shot from his rifle.

A few other objections were made to questions asked, which we have noted, but we find no prejudicial error.

Finally, it is urged that the sentence should be reduced from death to life imprisonment. In *Rorie* v. *State, supra,* this Court said:

''When this Court finds that the evidence is insufficient to support the punishment assessed, then we have the power to modify the punishment. Our cases clearly reflect, however, that this modification is done, not on a

basis of judicial clemency, but only in a case in which the evidence would not sustain the higher punishment assessed.''

See also *Turnage* v. *State*, 182 Ark. 74, 30 S. W. 2d 865.

It appearing that appellant received a fair trial, and no reversible error having been committed, the judgment is affirmed.

HOLT, J., dissents.

J. SEABORN HOLT, J., dissenting. I am strongly of the view that the trial court erred in failing clearly and specifically to instruct the jury that it had the right, and that it was its positive duty, if it found the defendant guilty of murder in the first degree to fix the punishment at either death in the electric chair or life imprisonment. Section 4042 of Pope's Digest—now Section 43-2153 Ark. Stats. 1947—provides: ''The jury shall have the right in all cases where the punishment is now death by law, to render a verdict of life imprisonment in the state penitentiary at hard labor''. In construing this section, we said in *Smith* v. *State*, 205 Ark. 1075, 172 S. W. 2d 248: ''This court has repeatedly held that it is error for the trial court to fail to instruct the jury that it might fix the punishment at life imprisonment. The defendant does not have to request this instruction. It is mandatory on the trial court in a first degree murder case to advise the jury of its power to fix the punishment at life imprisonment. See *Webb* v. *State*, 154 Ark. 67, 242 S. W. 380. An examination of the original transcript and motion for new trial in the Webb case shows that no assignment of error was contained in the motion for new trial about this failure to so instruct the jury, and yet this court, speaking by Mr. Justice Hart, on rehearing, said: 'In the present case, the finding of the jury might have been different had the court explained to the jury the alternative right given it by the statute in fixing the punishment of the accused. Therefore the majority of the court is of the opinion that the punishment prescribed by the statute being alternative in its character, and the statute having made it the duty of the

jury to exercise its discretion in fixing the punishment, it was part of the law applicable to the case, and the trial court erred in not charging the jury in regard to the discretion to be exercised by it in case the accused was found guilty of murder in the first degree. The error can be cured, however, by reducing the punishment of the appellant to life imprisonment. The sentence of death for murder in the first degree will be set aside, and the sentence reduced to imprisonment for life in the state penitentiary at hard labor, unless the Attorney General elects within two weeks to have the judgment reversed and the cause remanded for a new trial.' " Just to hand to the jury the verdict forms, as here, when a man's life is at stake was not sufficient to comply with the statute, in my opinion. The record does not show just what the court's instructions to the jury, if any, were on this important issue. All that is shown by the record is that after the argument of counsel, both for the State and defendant, "The court instructed the jury as to its verdict forms and the jury retired to consider its verdict". Who can say that the verdict here might not have been different had the court explained to the jury their alternative right fixed, by the statute, in assessing the punishment. Certainly this statute was a part of the law applicable to the case and made it the duty of the jury, once they found the defendant guilty of murder as here, to exercise their discretion in fixing the punishment at either life imprisonment or death. Especially should this duty have been emphasized by the court and clearly explained when, as here, they were dealing with an ignorant 18-year-old Negro boy who had had only about three years in school and whose sanity, according to the evidence, was in much doubt. Obviously, it seems to me, that if there be any doubt about what the trial court might have said to the jury (the record does not show) when the verdict forms were handed to them, that doubt should be resolved in favor of the defendant.

In the recent case of *Alford* v. *State*, 223 Ark. 330, 266 S. W. 2d 804, we said: "We think, however, that the court was in error in failing to inform the jury of its op-

tion to impose either the death sentence or life imprisonment. Since this option lies entirely with the jury the court is under the affirmative duty of bringing the matter to the jury's attention, even though that action is not requested by the accused. *Webb* v. *State,* 154 Ark. 67, 242 S. W. 380; *Smith* v. *State,* 205 Ark. 1075, 172 S. W. 2d 248.''

Accordingly, I would reduce the punishment to life imprisonment, giving the Attorney General the option to accept this modification, otherwise, I would remand for a new trial.