MOORE *v.* STATE.

4963                                              331 S. W. 2d 841

Opinion delivered February 15, 1960.

R. Dale Hopper, for appellant.

Bruce Bennett, Atty. General, By: Bill J. Davis, for appellee.

J. SEABORN HOLT, Associate Justice. Appellant, Lawrence Gene Moore, was found guilty by a jury of the crime of murder in the first degree while attempting burglary, and his punishment fixed at death in the electric chair. From the judgment comes this appeal. For reversal the appellant contends that the evidence was not sufficient to support the verdict and the verdict is "contrary to the law and the evidence."

The charge against appellant was based on § 41-2205 Ark. Stats. which provides: "All murder which shall be perpetrated by means of poison, . . . or which shall be committed in the perpetration of or in the attempt to perpetrate, arson, rape, robbery, burglary or larceny, shall be deemed murder in the first degree." The court appointed able counsel to represent appellant. At his trial, he first entered a plea of not guilty, but this plea was later changed to a plea of guilty and appellant submitted himself to the mercy of the court. A jury was then impaneled to assess Moore's punishment and after hearing all the testimony, returned a verdict of guilty of murder in the first degree as charged and fixed his punishment at death by electrocution. Moore took the witness stand and freely admitted his guilt. He testified, in effect,—and his testimony was corroborated,— that together with an accomplice, Robert Cuttler, with the intent to rob the coin box of a soft drink machine, he broke in the Dabbs School house near West Memphis, Arkansas, in the night-time of September 20, 1958. Appellant carried a pistol. While in the building, the night custodian (Ross Nichols), who lived on the premises

and had a bedroom in the building, apparently became disturbed and decided to investigate. Moore and his companion heard noises, became frightened and fled. As they were leaving the building, Moore fired a shot from his pistol down the hallway, which shot, he admitted, killed the deceased, Nichols. The bullet went through Nichols' bedroom door, struck him just above the abdomen, inflicting a wound from which he died shortly thereafter.

Moore testified: ''Q. Tell the Court how you got into the building. A. I broke a window on the lefthand side and me and Robert entered through the window, entered the school, went down through the hall. Intersection, hall running that way, and one that way. It was dark in there. I couldn't see nothing. We had to feel our way. As I got in I could see a door. Robert told me—it was raining—he heard some kind of noise. About that time a train was coming. I told him he didn't hear nothing, it was the train. I took the pistol out. By that time he ran around the steps. After he ran out, I don't know if he ran out or not, but I fired a shot as he was running, I fired a shot toward the noise. * * * That next day I got back home, I was about the barn and heard the boss man say he heard a man got killed in the school house. He asked what did I do. I told him I fired a shot in the school. * * * Q. You specifically intended to steal money when you broke the window and went in the school house? A. Yes, sir.''

Appellant was 19 years old, with only a fifth grade education. He admitted, and it was shown, that he had been convicted of eleven burglaries before his conviction in the present case.

Following the murder, Moore gave his half brother (James Mallory) a package which contained the pistol used and told him to throw it away. Following instructions, Mallory threw the package in the Ten Mile Bayou, right back of his house. A police officer, following Mallory's directions, found the pistol that Moore had used

in killing Nichols, where it had been thrown. We hold the evidence amply sufficient to support the verdict.

Appellant also contends, for reversal, that "after the appellant entered his plea of guilty to the charge set out in the information, and threw himself upon the mercy of the Court and Jury, it was error to allow the coroner also the mortician to testify as to the probing of bullet wounds in the body of the deceased, and other evidence as to blood stains on the floor. The calculated effect of all this testimony was to inflame the passions of the Jury to the prejudice of the appellant's plea for mercy." This contention was decided adversely to appellant in the recent case of Smith v. State, (Opinion delivered May 25, 1959) 230 Ark. 634, 324 S. W. 2d 341. We there said: "During the trial, various objects were introduced into evidence relating to the crime, including pictures of the victims in wicker baskets, burned beyond recognition, Rorie's bloodstained shirt, and the hammer used in the murder. Appellant objected to the introduction of several different objects introduced as evidence. This Court held such objections to be without merit, and stated: 'The cause was tried to the jury just as though the defendant had pleaded not guilty. Every essential fact of the crime was established. The jury was instructed on the degrees of murder and the discretion as to the punishment.' It would certainly appear that the exhibits here introduced, together with the evidence objected to, were plainly relevant to assist the jury in determining the degree of the crime."

Finally, the appellant argues that "The Statement of the Court as to the power of clemency of the Executive Department of the State Government tended to influence and inflame the minds of the Jury against arriving at a sentence of life imprisonment." The records reflects that during the course of the jury's deliberation, on request of one of the jurors to see the judge, the court directed the jury to return into open court and in appellant's presence, the f o l l o w i n g colloquy occurred. "COURT: Gentlemen, all proceedings in criminal cases must be in the presence of the defendant. Did you have

some question? JUROR: Yes, sir, as foreman of the jury, we want to know, can we give him life imprisonment with the understanding he is there for life? What is the minimum number of years he could serve? COURT: Gentlemen, I am unable to answer that question. The sole power of clemency lies within the executive branch of the government, which is the Governor of the State of Arkansas. I cannot answer your question with reference to that. JUROR: He can be paroled from life? COURT: I cannot say he can be paroled, gentlemen. I say the clemency power is in the hands of the Governor of the State of Arkansas. JUROR: Even if the jury would make a recommendation, it wouldn't be respected? COURT: It is within the discretion of the Governor of the State of Arkansas. He may exercise it regardless of any recommendation the jury makes. It is entirely within his discretion. JUROR: Thank you.'' We find no error here. In the recent case of *Boone* v. *State,* (Opinion delivered September 14, 1959) Law Reporter Vol. 105, No. 9, Page 366, where, in effect, the same type of occurrence was presented, we held a similar contention to be without merit. Our statute, which applies to a situation such as this, Ark. Stats. 43-2139, provides: ''After the jury retires for deliberation, if there is a disagreement between them as to any part of the evidence, or if they desire to be informed on a point of law, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the counsel of the parties.'' We think the trial court here carefully followed this statute and in appellant's presence, gave proper information to the jury in line with our holding in the Boone case above.

Finding no error, the judgment is affirmed.