## DEWEIN v. STATE.

### Opinion delivered October 12, 1914.

1. HOMICIDE—FIRST DEGREE MURDER—SUFFICIENCY OF THE EVIDENCE.— In a prosecution for homicide, evidence held sufficient to warrant a conviction of murder in the first degree.

2. CRIMINAL LAW—CONFESSION—WHEN VOLUNTARILY MADE.—Where threats of harm, promises of favor or benefits, inflictions of pain, a show of violence or inquisitorial methods are used to extort a confession, it will not be held to have been voluntarily made.

3. CRIMINAL LAW—CONFESSION—UNDUE INFLUENCE—RULE.—In determining whether a confession was voluntarily made, the court must look to the whole situation and surroundings of the accused, and it is proper to consider his age, intellectual strength or weakness, the manner in which he was questioned, the fact that he is in jail, and everything connected with his situation.

4. CRIMINAL LAW—INVOLUNTARY CONFESSION.—In order to render a confession involuntary, there must be some threat or inducement held out to overcome the will of the accused.

5. JURORS—OPINION—COMPETENCY.—In a prosecution for homicide a juror will be held competent who states that he had formed an opinion of defendant's guilt from reading an alleged confession in a newspaper, but that nothing he had read or heard would influence his verdict, and that he could give defendant an impartial

trial and would be guided by, and decide the case entirely upon, the evidence introduced before the jury and upon the law as given by the court.

6.  CRIMINAL PROCEDURE—JUROR—PEREMPTORY CHALLENGE.—Where the defendant had not exhausted all of his peremptory challenges, the court, in the exercise of its discretion, may permit the State to peremptorily challenge a juror after he has been accepted on the jury.

7.  CRIMINAL LAW—HOMICIDE—INSTRUCTION ON SECOND DEGREE MURDER. —In a prosecution for homicide, when all the evidence showed first degree murder, and there was no evidence introduced tending to show defendant to be guilty of second degree murder, it is proper for the court to refuse an instruction on that issue.

8.  CRIMINAL LAW—CONFESSION—WEIGHT OF EVIDENCE—INSTRUCTION.— In a prosecution for homicide an instruction is erroneous and properly refused, which tells the jury how much weight they must give to a confession of the accused, which has been introduced in evidence.

9.  CRIMINAL LAW—CONFESSION—WEIGHT OF EVIDENCE—INSTRUCTION.— The question of the admissibility of a confession is for the court, and after it is admitted the jury are the judges of the weight to be given to it, and an instruction is properly refused which charges the jury that, in order to warrant their considering the confession, they must believe beyond a reasonable doubt that the confession was voluntarily made.

10. NEW TRIAL—NEW EVIDENCE—IMPEACHING TESTIMONY.—Newly discovered evidence that goes only to impeach the credibility of a witness is not ground for a new trial.

Appeal from Saline Circuit Court; *W. H. Evans,* Judge; affirmed.

*Charles P. Johnson,* and *Jones & Owens,* for appellant.

1.  The record, we think, conclusively shows the incompetency of the venireman, G. D. Smith, to sit as a juror, because of his having read in a newspaper what purported to be the original confession made by the defendant and had formed a fixed opinion as to his guilt. 45 Ark. 165, 170; 13 Ark. 720; 19 Ark. 156; 1 Bishop, Cr. Proc. § 910; 8 Cal. 359; 40 Cal. 268; 56 Ark. 381, 402; 69 Ark. 322; 102 Ark. 180; 140 Am. St. Rep. 1086.

2.  Appellant was entitled to a new trial, and the cause should be reversed because the juror Dodson testified falsely upon his *voir dire* examination, as to any

bias or prejudice he might have against the defendant, and his false statements were unknown to appellant and his counsel at the time of such examination. Fed. Cas. No. 5, p. 126; 3 U. S., 3 Dall., 515; 9 Cal. 298; 4 Ill. 412; 28 Tenn. 411; 41 Tex. 573; 25 Tex. 26.

3. It was within the province of the jury to say from the evidence whether the crime was murder in the first degree or second degree, and to this end they were entitled to an instruction, as offered by the defendant, giving the distinction between the degrees of murder. 162 U. S. 313; 58 Pa. 17.

4. After the venireman Glass had qualified as a competent juror, and defendant had exhausted his challenges, it was prejudicial error for the court to sustain the challenge for cause interposed by the State.

Likewise it was error to permit the State to challenge peremptorily the juror Gunter, the next day after he had been examined, found qualified and accepted as a juror by both sides, and without assigning a reason therefor as this court has repeatedly held should be done.

5. The so-called confession should have been excluded because. it was incomplete. This court has repeatedly held that a confession in part can not be received, but that the defendant is entitled to the whole of the confession. Moreover such confession "must be free from the taint of official inducement either from the flattery of hope or the torture of fear." 107 Ark. 568.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* assistant, for appellee.

1. It was not error to accept the venireman Smith as a juror. Opinions formed from mere rumor or from newspaper accounts, do not render a juror incompetent, if, on his *voir dire* he declares that he can and will lay aside any opinion he may have formed and be governed only by the law and the evidence of the case. 85 Ark. 64; 101 Ark. 443; 104 Ark. 616; 109 Ark. 450.

2. The court properly refused to grant a new trial on the alleged ground of the incompetency of the juror Dodson. His affidavit to the effect that he had never had the conversations attributed to him, nor discussed the merits of the case until after he was chosen as a juror and the verdict had been rendered, is supported by the

affidavits of several other reputable men, and justified the action of the court.   90 Ark. 400; 97 Ark. 92; 99 Ark. 407; 109 Ark. 476; 72 Ark. 158.

3.   If appellant was guilty of murder at all, it was murder done in the attempt to commit robbery or in the completed act of robbery, which the statute makes murder in the first degree.   Kirby's Dig., § 1766.   There was nothing in the case on which to base an instruction on murder in the second degree.   52 Ark. 345; 74 Ark. 444; 85 Ark. 514; 88 Ark. 447.

4.   The State had the right to challenge juror Gunter after he had been accepted by both sides, and there was no error in permitting it.   81 Ark. 589.

5.   Appellant's confessions were properly admitted. 39 Ark. 379.

The court properly refused to give instruction 20 requested by the defendant, it being the province of the court to determine whether or not a confession shall be admitted.

HART, J.   Clarence Dewein was indicted, tried before a jury and convicted of murder in the first degree.   From the judgment of conviction he has duly prosecuted an appeal to this court.   The facts are substantially as follows:

L. H. Thompson, in November, 1913, resided in the south end of the town of Benton in Saline County, Arkansas, and was killed one evening something after 9 o'clock.   He owned and operated a store and also resided there and ran a hotel or rooming house in connection with his business.   On the evening he was killed his wife left him counting his money and went to an adjoining room to go to bed.   After he finished counting his money he went out on the front porch to smoke.   There was a lighted lamp in one of the front windows.   A neighbor, who was also sitting on his front porch smoking, saw two men approaching the store of the deceased.   Just before they got there, the neighbor testified, they separated and one of them, who was dressed in a dark gray shirt, with a cap pulled down over his face, walked up on the porch where Thompson sat and said something to him.   Thompson got up and walked into the store and the man followed him.   Just as the man followed Thompson into the door he nodded to his companion who had come up and was

playing with a cat on the porch. His companion then followed him into the store and the light was put out. This neighbor further stated that he did not hear any commotion but became suspicious of the men from their actions and went into the house and procured his gun. When he came out he saw two men walking rapidly away and was unable to capture them. The second man had a long coat buttoned up, and also had his cap pulled down over his face.

Mrs. Thompson heard a commotion in the store room, returned there and found her husband sitting on the floor complaining of his head. A coupling pin was lying on the floor right beside him. A physician was summoned at once and upon examination of Thompson found the base of his skull crushed all to pieces. There was a stroke on the left side and another on the right about three inches long. The physician opened up Thompson's skull at the place where it was fractured and took out a piece of the skull about the size of a dollar. He then raised the skull and said that the old man's breathing became good. Thompson died the next day about 2 o'clock. The physician testified that blows from a blunt instrument caused his death and that the most severe blow was at the base of the brain. He found a coupling pin, which was all bloody and had hairs on it, near the body. The deceased was about seventy years of age at the time he was killed and was a strong and vigorous man for that age.

The manager of the electric light plant at Benton, which was near Thompson's store, testified that about twenty minutes before the killing was reported to him he saw defendant in front of the light plant, that he had on a pair of light looking pants, a coat and a black cap; that he had a companion with him who had on a gray shirt and a brown necktie; that the defendant's companion did not have on a coat but had on a pair of leggings. The light plant was about eighty yards from the store of the deceased.

Mrs. Sarah Ewing testified: At the time the killing occurred I was running a boarding house in Benton and the defendant boarded with me. Joe Strong assisted me in my work. My boarding house was about a quarter of

a mile from where Mr. Thompson was killed. The defendant, on the night in question, had supper at my house and went away after supper. Later on he came back and stayed all night. He did not eat any breakfast. He went to Little Rock Sunday morning, came back that evening, ate supper and stayed all night at my house. On Monday, after dinner, I went to the defendant's room and began talking to him about the killing and asked him if he was not implicated in it. He first denied it and then said that he was. I then asked him to tell me all about it and asked him how he came to be in it. He said that he and some companions had gone to Mr. Thompson's store prior to the night of the killing and had seen him counting money; that on the night of the killing he went down to see if they could get the money; that when he got down there Mr. Thompson was sitting on the porch playing with a little cat; that Joe Strong was with him and that Strong grabbed Thompson around the neck; that Thompson got loose and ran into the house; that Joe Strong hit Thompson one lick with the coupling pin and that he then took the pin and finished him; that Joe got blood on his clothes and, after they left the scene of the killing, pulled off his shirt and leggings and threw them into a creek and that he pulled off his coat and gave it to Joe to wear until they got to the house.

On cross-examination Mrs. Ewing stated that she told the defendant that if he would tell her about the killing she would not say anything about it. Afterwards she reported the matter to the officers and her statement was written down by them. She said that the defendant had said to her that they did not intend to kill the deceased but that it turned out worse than they thought.

After the defendant was arrested it was reported to the officers that a shirt and some leggings would be found at a certain place in a creek near by. They made a search there and found the shirt and leggings which were all bloody. They also found a pocket book which had belonged to the deceased. The defendant's grip was also searched after his arrest and a pistol was found in it which Mrs. Thompson identified as being like one her husband owned. The pocket book found after the killing

was empty when found but contained about ten dollars when last in Mr. Thompson's possession.

The defendant made a written confession which is substantially as follows:  My name is Clarence Dewein; I will be twenty years old on my next birthday; 1 was born in Belleville, Illinois, and left home about a month ago; I came to Benton and have been boarding with Mrs. Ewing nearly ever since.  Several days prior to the killing one of the boarders stated that he had seen Mr. Thompson counting his money and said that a man could get it if he was on to his business.  On Wednesday night preceding the killing William Herman and I told Joe Strong about the old man's money and told him to go over and look around.  Joe went to the old man's store and bought some tobacco and came back and reported that there was no chance of getting it that night and said we would have to let it go till some other night.  On Saturday night Strong and I went down to Reed's store and from there down towards the light plant.  We then went to old man Thompson's store and Joe went in and got a package of tobacco.  He came back and said there was no one in the store but the old man.  We walked on down the block and came back and saw the old man sitting on the porch.  We then walked away again and looked for something to hit him on the head with.  We came to a box car and saw a coupling pin.  We took it and went on back to the store and told the old man we wanted some cheese and crackers.  Joe went in with the old man and I stayed on the porch playing with the cat.  When the old man went behind the counter he started to wait on Joe.  I walked in at the door and closed it and blew out the light.  In the mean time they had gotten to the rear of the store and Joe hit the old man with the coupling pin and called to me.  I started towards him and he picked up the coupling pin and hit the old man again and said that would kill him.  Joe went through his pockets and got his money, pistol and knife.  After we left Joe washed the blood off his hands in the creek and pulled off his shirt and threw it in the creek.  I gave him my coat to put on until we got to the house.  Joe and I went back to Mrs. Ewing's and slept there that night.  I went to Little Rock Sunday morning and returned that afternoon.  On

the night of the killing I had on a blue serge coat and brown corduroy cap and Joe had on a blue shirt and brown tie, a small black cap and was in his shirt sleeves. We threw the money sack or pocket book of Thompson away when near our boarding house on the night he was killed.

The parents of the defendant were present at the trial and testified that when he was about nine years old he received a severe lick on the head and since that time his intellect had been weak and that his mind was that of a child about nine or ten years of age; that he had always borne a good reputation and had stayed with them until he went to Benton from their home in Illinois a few weeks before the killing occurred. The defendant's father was a saloon keeper and the defendant was working in the saloon with him prior to leaving for Arkansas.

The defendant testified in his own behalf substantially as follows: I came to Benton from Illinois a few weeks before the killing occurred and boarded with Mrs. Ewing; Joe Strong was working for her and I got acquainted with him. On the night of the killing Joe and I went to the business part of the town and as we started home we passed old man Thompson's place and Joe told me to wait a minute, that he wanted to get something to eat. This was about 9 o'clock. I did not go into the store with him and when he came out he handed me a gun to keep for him. When we got to the boarding house he gave me some money and asked me to keep it for him until the next day. I did not go into Thompson's store that night but stayed on the porch and played with a little cat while Joe went in there. There was no blood on Joe when he came out and I never saw any blood on any of his clothes. I did not hear any commotion in the store and did not know that Joe had killed the old man. I had on a coat on the night that Thompson was killed and have worn the same coat ever since. I was not in the house and had nothing whatever to do with the killing of the deceased.

(1) It is earnestly insisted by counsel for the defendant that the testimony is not sufficient to warrant the verdict. From the summary which has been given of the evidence as it appears in the record it clearly ap-

pears that it was sufficient to warrant the verdict and no useful purpose could be served by going into an extended analysis of it.

It is also insisted by counsel for the defendant that his confession was improperly admitted in evidence because it was not voluntary. After the defendant was arrested he was taken from the jail one night and carried to the court room and was locked in a room in the court-house with the mayor of the town of Benton. The mayor was a man about sixty-five years of age and had formerly been sheriff of the county. He testified positively that he made no threats against the defendant and offered him no inducement whatever to make the confession. He stated that at first the defendant denied that he was implicated in the killing; that he told the defendant that Mrs. Ewing had made a written statement of the confession which he had made to her and that he had seen that statement; that he recounted to the defendant what purported to be Mrs. Ewing's written statement of his confession to her and that the defendant then admitted that he was implicated in the killing and said that he was willing to make a confession of it and did so. He agreed that his confession might be reduced to writing and the mayor then called in the sheriff and a lawyer who had been employed to prosecute the defendant and the defendant's statement was reduced to writing and was read over to him and signed by him. The defendant made some correction in the statement when it was read over to him. The defendant's statement was made in response to questions asked him but the questions were not reduced to writing and his confession appears in narrative form.

The defendant stated that he was taken from jail to the sheriff's office and met Mr. Shoppach, the mayor, there a little after 7 o'clock in the evening; that they locked him in the room with the mayor and he began questioning him and told him that if he would tell him everything he would take care of him; that they told him about having Mrs. Ewing's statement and that they had Joe Strong; that they asked him if he did it and that he told them that he did not; that Mr. Utley who wrote down the statement assisted in prosecuting him and was present when Mr. Shoppach questioned him; that Mr.

Utley also questioned him; that he did not remember what was in the statement, though he thought it was read over to him; that he had no one there to represent him but just told them everything; and that he first told them he had nothing to do with the killing.

In the case of *Greenwood* v. *State,* 107 Ark. 568, the court held: "A confession of guilt, to be admissible, must be free from the taint of official inducement proceeding from either defendant's hope or fear; and a confession to be admissible must be voluntary and made in the absence of threat of injury or promise of reward, and made in the absence of any influence which might swerve him from the truth.

"Where a confession is obtained from defendant by persistent questioning by officers, but without deception, threat, hope of reward or inducement of any kind, it is admissible as a voluntary confession." See, also, *Hardin* v. *State,* 66 Ark. 53.

It is insisted by counsel for defendant that his confession was not voluntary because he was not warned that it would be used against him. In the Greenwood case, *supra,* we held that in the absence of a statute requiring it, the failure to warn or caution the accused while in custody that his statement would be used against him does not render it involuntary. That this is the prevailing rule, see case note to *Ammons* v. *State,* 18 L. R. A. New Series, 768, 791.

In the Greenwood case, *supra,* we also held that the fact that the statement of accused was elicited by questions put to him by officers or by private persons does not render them inadmissible. To the same effect see note to *Ammons* v. *State,* 18 L. R. A. (N. S.) 799.

(2) It has been said that no general rule can be formulated for determining when a confession is voluntary because the character of the inducements held out to a person must depend very much upon the circumstances of each case. Where threats of harm, promises of favor or benefits, inflictions of pain, a show of violence or inquisitorial methods are used to extort a confession, then the confession is attributed to such influences.

(3-4) It may be said, also, that in determining whether a confession is voluntary or not, the court should look to the whole situation and surrounding of the accused. Hence it is proper to consider his age, the strength or weakness of his intellect, the manner in which he is questioned, the fact that he is in jail, and everything connected with his situation. In order to render a confession involuntary there must be some threat or inducement held out to overcome his will.

In the instant case it is true that the defendant was in jail and that he had no friends with him at the time he was questioned by the mayor. The mayor says that no one was in the room with him at the time the defendant first made his confession to him and that he made no threats against the defendant and offered no inducements whatever to him to make the confession. He only confronted him with the confession which Mrs. Ewing said he had made to her. No harsh treatment was used and no inquisitorial methods were employed to induce him to confess. The court had all the facts before him and his decision in the matter did not rest upon any one fact but upon a combination of them all. The defendant was before him and the court had an opportunity to judge of his intellect by the manner in which he testified, and when the whole situation and surroundings are taken and considered together we do not think the court erred in permitting the confession to go before the jury.

(5) It is next insisted that the court erred in its ruling upon the challenge of the defendant to the juror G. D. Smith. The juror testified that he had read in a Benton paper what purported to be the confession of the defendant and that at the time he read it he had a definite opinion as to the guilt or innocence of the defendant. He further stated that if he were accepted as a juror he would not let anything he had read or heard influence his verdict and that he could give the defendant a fair and impartial trial upon the law and the evidence, uninfluenced by the opinion he entertained when he read the purported confession. He said that he could go into the jury box and decide the case entirely upon the evidence introduced before the jury and upon the law as given by

the court. The court held him to be a competent juror and we think this holding was correct.

In the case of *Hardin* v. *State,* 66 Ark. 53, the court held: "A juror in a criminal case who states that, from rumor and from reading the newspapers, he has formed an opinion as to defendant's guilt which it will require evidence to remove, but that, for the purpose of the trial, he can disregard such opinion, and give defendant a fair and impartial trial, is not incompetent, if it does not appear that he entertained any prejudice against defendant. This rule was recognized in *Sullins* v. *State,* 79 Ark. 127; but the juror was there held incompetent because his brother-in-law, in whom he had great confidence, and who was also a witness for the State, had published the newspaper reports and under such circumstances the court said the statement on which the juror based his opinion was not a mere rumor, but amounted to a statement of the facts by a witness.

In the following cases it has been held that opinions based upon newspaper reports of confessions did not disqualify a juror: *State* v. *Church,* 199 Mo. 605, 98 S. W. 16; *State* v. *Potter,* 18 Conn. 166; *State* v. *Wooley,* 215 Mo. 620, 115 S. W. 417; *State* v. *Bobbitt,* 215 Mo. 10, 114 S. W. 511.

In the instant case the juror stated positively that he could disregard the opinion formed by him from the newspaper account of the purported confession and that if the testimony turned out different from the newspaper account that his verdict would be based solely upon the evidence given to the jury. From the juror's testimony it appears that he was entirely indifferent in the case and the court properly refused the defendant's challenge for cause.

(6) It is also contended by counsel for defendant that it was error for the court to permit the State to peremptorily challenge the juror G. W. Gunter. The juror was accepted on the first day of the trial and on the next day after the defendant had exhausted all of his challenges but one the State was permitted to exercise a peremptory challenge and excuse Gunter from the jury. Thus it will be seen that the defendant had not exhausted

all of his peremptory challenges and the court, in the exercise of its discretion, could permit the State to peremptorily challenge the juror after he was accepted on the jury. See *McGough* v. *State,* 113 Ark. 301; 167 S. W. (Ark.) 857; *Carr* v. *State,* 81 Ark. 589; *Allen* v. *State,* 70 Ark. 337.

It is next contended by counsel for the defendant that the court erred in refusing him a new trial on account of Dodson's incompetency as a juror. The defendant attached several affidavits to his motion for a new trial alleging that G. E. Dodson, one of the jurors, had formed and expressed an opinion prior to his being accepted as such juror and that he had stated to different persons that all of the parties connected with the killing should be hanged and that if he had his way about it he would not wait for any court. The juror was examined under oath and denied that he made any such statements as those ascribed to him and stated that he had never discussed the merits of the case at any time or place until after he had been chosen as a juror and the verdict had been rendered. The court was in possession of all the facts relating to the disqualification of the juror and it can not be said that the court abused its discretion in refusing to grant the defendant a new trial on this ground.

(7) It is next insisted by counsel for the defendant that the court erred in refusing to instruct the jury upon murder in the second degree. Section 1766 Kirby's Digest provides that all murder which shall be committed in the perpetration or in the attempt to perpetrate arson, rape, robbery, burglary or larceny shall be deemed murder in the first degree. The jury, by its verdict, has accepted as true the testimony of the witnesses for the State. That testimony shows that the deceased was killed while the defendant and a companion were attempting to rob him. There is nothing whatever to contradict the testimony in this respect except the testimony of the defendant to the effect that he was not present and did not aid in the commission of the crime. It is true that we have frequently said that the trial court should not in any case indicate an opinion as to what the facts establish, but in properly giving the law to the jury the court must of necessity determine whether there is any evidence

at all justifying a particular instruction. There was no evidence adduced before the jury, either for the State or the defendant, tending to show the defendant guilty of murder in the second degree. Hence, there was no evidence upon which to base an instruction for murder in the second degree, and the court properly refused it. *Allison* v. *State,* 74 Ark. 444; *Jones* v. *State,* 52 Ark. 345.

(8) It may be also said that the court correctly modified instruction No. 19 asked for by the defendant. This instruction, as originally asked for, was argumentative and also contained an indication as to the weight the jury should give to the confession of the defendant. As requested the instruction was erroneous because it told the jury that they must weigh with care the confessions of the defendant. Of course it was proper for the jury to take into consideration all the surrounding facts attending the confession as introduced in evidence and to consider it in connection with all the other evidence introduced in the case. But it was not within the province of the court to tell the jury how much weight they should give to the confession. This was peculiarly within the province of the jury.

(9) It is next insisted by counsel for the defendant that the court erred in refusing to give instruction No. 20 asked for by him. This instruction in effect told the jury that in order to warrant their considering any alleged confession made by the defendant and introduced in evidence they must believe beyond a reasonable doubt that such confession was made voluntarily upon the part of the defendant. The question of the admissibility of the confession of the defendant was for the court. After the court admitted it in evidence the jury, of course, were the judges of the weight to be given to it. See *Greenwood* v. *State, supra.* The court, therefore, properly refused this instruction.

(10) It is next insisted by counsel for the defendant that the court should have granted him a new trial on the ground of newly discovered evidence. It may be said, in brief, that the newly discovered evidence only went to attack the credibility of the witness Mrs. Ewing and it is well settled in this State that newly discovered

evidence that goes only to impeach the credibility of a witness is not ground for a new trial. *Smith* v. *State,* 90 Ark. 435; *Young* v. *State,* 99 Ark. 407; *Russell* v. *State,* 97 Ark. 92.

Independent of the confessions of the defendant it was shown that the deceased was murdered in his storehouse by persons who came there for the purpose of robbing him. The manager of the electric light plant testified that he saw the defendant and Joe Strong in front of the light plant about twenty minutes before the killing occurred; that each of them had on a cap and that the defendant had on a blue or black serge coat, buttoned up around his neck; and that Joe Strong had on a gray shirt, a brown tie and was without a coat.

A neighbor of the deceased testified that he saw men answering to this description enter the storehouse of the deceased just before he was murdered and robbed and that they immediately ran off after the robbery and murder had been accomplished. This testimony abundantly established that the crime of murder was committed by some one and the facts point toward the defendant and Joe Strong as being the perpetrators of the crime. This evidence, when taken in connection with the confession of the defendant, if believed by the jury, abundantly warranted the verdict.

We are of the opinion, upon an examination of the whole record that the defendant had a fair trial and that every phase of the evidence was properly submitted to the jury upon correct instructions. Therefore the judgment must be affirmed.