CLYDE RAY GLOVER v. STATE OF ARKANSAS

5479 455 S. W. 2d 670

Opinion delivered June 29, 1970

*W. B. Howard* and *Jack Segars,* for appellant.

*Joe Purcell,* Attorney General; *Mike Wilson,* Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. Appellant Clyde Ray Glover was found guilty of murder in the first degree and sentenced to death for the alleged killing of Judy Evans. The gruesome facts, as related by an accomplice and as told by appellant to his own sixteen year old son, will not be reiterated because the evidence is clearly sufficient to sustain the verdict. In fact the sufficiency of the evidence is recognized in appellant's brief as follows:

"The evidence of the state, if believed by the trier of fact, was abundantly ample to support his con-

viction and sentence to death by electrocution. In the prosecution of this appeal, it will not be our purpose to persuade the court that the evidence was not sufficient to sustain a conviction. As a matter of fact, the evidence of the State, if believed, reveals one of the more gruesome murders and subsequent attempt to conceal murder recorded in the annals of this State. There was and is a serious question about the credibility of each and every material witness for the State. The defendant's defense was predicated upon an alibi and upon the lack of credibility of all material witnesses called against him."

For reversal appellant relies upon the following points:

I. "The court erred in refusing to quash the search warrant issued on March 5, 1969, and in refusing to exclude evidence obtained pursuant to such search warrant.

II. The court erred in overruling appellant's challenges for cause to talesmen Ralph Shoe, Glenn T. Boyd, Wayne L. Britewell and Alvin Jackson White.

III. The court erred in refusing to allow the defendant to prove on cross-examination of the state witness Peggy Pitcher that said witness had been told that the defendant and her husband had been double-dating.

IV. The court erred in commenting on the weight of the evidence by stating in effect in the presence of the jury that there was no testimony justifying the inference that witness Leorn Pitcher had assaulted the decedent with an intent to kill her.

V. The court erred in allowing the accomplice Latham to testify that after the crime he

showed the officers the place where a ring, allegedly taken from the finger of the decedent, was buried and that the officers recovered the ring at the place pointed out by the witness.

VI. The court erred in allowing Deputy Prosecuting Attorney Howard Mayes to comment on defendant's failure to take the witness stand.

VII. The court erred in refusing to give defendant's requested instruction No. 1."

Because we are reversing the judgment for failure of the trial court to excuse from the jury talesmen Ralph Shoe, Glenn T. Boyd, Wayne L. Britewell and Alvin Jackson White we do not discuss Points IV and VI. They are not likely to arise on a new trial.

### POINT II

The record, with respect to talesmen Shoe, Boyd, Britewell and Jackson, is as follows:

Juror Ralph Shoe when interrogated by the court stated:

"I just formed my own opinion. A witness could come on the stand and change everything. I formed an opinion from what I read about it and heard talked about it. As I say, a witness could change it all around. I would disregard whatever opinions I have formed in the past and base my verdict simply and strictly on the evidence given and the law given without regard to any opinions which I may have previously held. I did not talk to any body who purported to be a witness."

When interrogated by defendant's counsel the juror stated:

"My present mental state is that I would attempt to follow what the court says about the evidence and the law and consider only the evidence heard from the witness stand and the law given me by

the court. But, in that connection, until I hear evidence from the witness stand that gives me grounds to believe something which would cause me to change my ideas, I would still have those ideas. . ."

Juror Glenn T. Boyd when questioned by the court said that he had formed an opinion and that he realized whatever he read in the paper was hearsay and if selected as a juror he would disregard it and try the appellant on the evidence he heard in court. But when interrogated by defendant's counsel, he said:

"I formed some tentative opinions about the matter which I presently entertain. While I indicated to His Honor that I would be willing to set this opinion aside and try the case on the law and the evidence, until some evidence is introduced to remove that opinion, I will still have it."

Juror Wayne L. Britewell testified as follows:

Interrogation by court:

"I recall reading about the death of the decedent. It is a little hard not to form an opinion. Regardless of the opinions I have formed and regardless of whether what I may have read or heard is true, I would try it on the evidence I hear in court to the best of my ability. I would set these opinions aside.

Interrogation by appellant's counsel:

"In answering Judge Light, I stated that what I had read and heard was the only evidence I had, that I believe that I was supposed to go by the evidence. Until such time as I did hear evidence in this case, I would entertain my present opinion.

Interrogation by court:

"The opinions I have formed were arrived at either

from hearing about it from other people who did not purport to be witnesses or from what I read in the paper. This is an opinion which I could readily disregard. I would readily disregard such an opinion and base my verdict wholly and solely on the evidence in the case.

Interrogation by counsel:

"It would take some evidence to remove my present opinion."

Juror Alvin Jackson White after interrogation by the court finally stated to appellant's counsel:

"Although I have indicated an answer to his Honor's questions that I am perfectly willing to set aside my present opinions to the best of my ability and try the case on the law and the evidence, it would take evidence to remove that opinion and I would keep that opinion until I heard evidence to the contrary."

Both the U. S. Constitution, Amendment No. 6, and the Arkansas Constitution, Art. 2, § 10, guarantee the accused in all criminal prosecutions trial "by impartial jury". In a case involving a sensational killing and newspaper publicity it is almost impossible to find an informed citizen to serve on the jury who has not heard about the case and who has not formed some opinion based upon the newspaper accounts. In such cases it is the duty of the trial court to determine whether an opinion has been formed and whether the jurors can lay aside such opinion and give to the accused the benefit of all doubts that the law requires while trying him on the law and the evidence given to them during the trial. When a venireman states that he can lay aside such preconceived opinions and give to the accused the benefit of the doubts to which he is entitled under law, it is generally conceded that the venireman qualifies as "impartial" under the constitutional requirements. See *Rowe* v. *State,* 224 Ark. 671, 275 S. W. 2d 887 (1955), where we said:

"While it is true that some of the veniremen said that they had formed tentative opinions based upon newspaper reports or what some one had told them, all who were accepted stated that they could and would be guided solely by the testimony, giving to the defendant the benefit of all doubts that the law defines. There was no error in accepting these men. It is no longer practicable in an intelligent society to select jurors from a psychological vacuum or from a stratum where information common to the community as a whole is lacking."

In *Irvin* v. *Dowd*, 366 U. S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1939 (1961), the U. S. Supreme Court, speaking through Mr. Justice Tom Clark, discussed the "impartial" juror requirement in this language:

". . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *Re Oliver*, 333 U. S. 257, 92 L. Ed 682, 68 S. Ct. 499; *Tumey* v. *Ohio*, 273 U. S. 510, 71 L. Ed. 749, 47 S. Ct. 437, 50 ALR 1243 'A fair trial in a fair tribunal is a basic requirment of due process.' *Re Murchison*, 349 U. S. 133, 136, 99 L. Ed. 942, 946, 75 S. Ct. 623. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. *Thompson* v. *Louisville*, 362 U. S. 199, 4 L. Ed 2d 654, 80 S. Ct. 624. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' *Reynolds* v. *United States*, 98 U. S. 145, 155, 25 L. Ed. 244, 246.

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies* v. *Illinois,* 123 U. S. 131, 31 L. Ed. 80, 8 S. Ct. 21, 22; *Holt* v. *United States,* 218 U. S. 245, 54 L. Ed. 1021, 31 S. Ct. 2, 20 Ann. Cas. 1138; *Reynolds* v. *United States* (U. S.) *supra.*

The adoption of such a rule, however, 'cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.' *Lisenba* v. *California,* 314 U. S. 219, 236, 86 L. Ed. 166, 180, 62 S. Ct. 280. As stated in *Reynolds,* the test is 'whether the nature and strength of the opinion formed are such as in law necessarily. . . raise the presumption of partiality. The question thus presented is one of mixed law and fact . . . .' At p. 156. 'The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside. . . . If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed.' At p. 157. As was stated in *Brown* v. *Allen,* 344 U. S. 443, 507, 97 L. Ed. 469, 515, 73 S. Ct. 397, the so-called mixed questions or the application of constitu-

tional principles to the facts as found leave the duty of adjudication with the federal judge.' It was, therefore, the duty of the Court of Appeals to independently evaluate the voir dire testimony of the impaneled jurors."

Thus it appears to us that talesmen Shoe, Boyd, Britewell and White, in stating that they would keep their opinion formed from reading the newspaper until they heard evidence to the contrary, did not qualify as "impartial" jurors within the meaning of either the U. S. Constitution or the Constitution' of Arkansas. It follows that the trial court erred in not discharging the four talesmen for cause.

The error is clearly before us because the appellant used four of his peremptory challenges on the four talesmen involved and after all of his peremptory challenges were exhausted, he caused the record to show that if he had not been required to so exhaust his challenges on these four talesmen, he would have peremptorily challenged talesman Burns who sat on the jury.

## POINT I

In examining the points raised by the appellant, we find no error in the trial court's refusal to quash the search warrant and exclude the evidence obtained thereby. Both the appellant and the state rely on our decision in *Walton* v. *State,* 245 Ark. 84, 431 S. W. 2d 462 (1968), for their respective positions on this point. In *Walton* we said:

". . . While an affidavit for a search warrant may be based upon personal observations of the affiant, it may also be based, in whole or in part, on hearsay information. When it is based upon hearsay, the magistrate must be informed of some of the underlying circumstances from which an informant concluded that the object of a proposed search was where he said it was. He must also be advised

of some of the circumstances from which the officer concludes that the informer (whose identity need not be then disclosed) is credible or his information reliable. An affidavit, which does not contain any affirmative allegation that affiant speaks with personal knowledge of the matters contained therein and also fails to show that information given by an unidentified source was not merely his suspicion, belief or conclusion, has been held not to show probable cause."

It will be noted that while an affidavit for a search warrant may be based upon personal observation of the affiant, it may also be based on hearsay information. When the affidavit is based upon hearsay, the magistrate must be informed of some of the underlying circumstances from which an informant concluded that the object of the proposed search was where he said it was. The rule, as we announced it in *Walton,* is simply designed to eliminate issuance of search warrants on mere suspicion expressed to the issuing magistrate by affiants based on hearsay. The affiants must give the magistrate the benefit of their personal observation when the warrant is sought on that basis, and the affiant must pass on to the magistrate the facts and circumstances the affiant obtained on hearsay information, when the warrant is sought on that basis. The rule, as set out in *Walton,* goes no further than good common sense directs in the interest of justice and fair play. Neither this court nor any other court, insofar as we have been able to determine, has held that an affiant must *prove beyond a reasonable doubt* the truth of the contents of his affidavit for a search warrant before a valid search warrant may be issued by the magistrate.

The object of the search in the case at bar was a revolving red light and the affidavit states that the officers had reasonable ground for believing that "a revolving red light, DC current, was owned by Ray Glover and that said revolving red light is now located upon the property and premises of the said Ray

Glover on Highway 1 North of Paragould, in Greene County, Arkansas; and that said revolving red light was used upon the highway in this county on or about March 1, 1969, to stop a vehicle driven by one Judy Evans; and the affiants have reasonable grounds for believing said Judy Evans was killed and murdered on that date by Ray Glover together with other person or persons." Now, concerning the information furnished by the officers in their affidavit as to the underlying circumstances from which their informant concluded that the red light was where he said it was; and as to the advice of some of the circumstances from which the officers concluded that the informer was credible or his information reliable, the officers state in their affidavit as follows:

> "That affiants have been so informed by an informant known to these affiants, the informant stating that he was present with Ray Glover at the time the revolving red light was placed in a building upon the aforementioned property of Ray Glover.
>
> That the informant is known to the affiants and that previous information supplied by said informant has proven reliable and accurate and that the affiants have reason to believe that the information herein is also reliable and dependable.
>
> That on another occasion informant gave information that a certain ring was worn upon the person of the said Judy Evans at the time of her death; that the ring was removed by Ray Glover and in the presence of the informant buried at a certain location supplied to affiants and other investigating officers; that upon a search of the location given by the informant said ring was in fact found.
>
> That on other occasions this informant has supplied information concerning theft of automobiles by person or persons when in fact said automobiles had been reported stolen.

That affiants further state that the said Ray Glover was at all times mentioned herein wearing a leather jacket, shirt, trousers, shoes, at the time of the killing of the said Judy Evans and upon informant's information said clothing is believed to be located upon the premises herein described; that said clothing is believed to contain evidence of the killing."

We simply hold that the affidavit in the case at bar furnished the magistrate all that it was necessary for him to know, and the court did not err in refusing to quash the search warrant or exclude the evidence obtained thereunder.

## POINT III

As to appellant's third point, the State's witness, Peggy Pitcher, admitted that she was involved in civil litigation with the appellant and she readily admitted that she disliked him. Mrs. Pitcher and her husband had purchased a house trailer from appellant which he repossessed with its contents, which Mrs. Pitcher says was purchased from other parties and belonged to her. Mrs. Pitcher's *dislike for the appellant* and not the *reason for her dislike,* might have been such cause that would affect her credibility as a witness. *Perkins v. State,* 168 Ark. 710, 271 S. W. 326 (1925). Mrs. Pitcher had already admitted her dislike for appellant and we find no error in the court's refusal to permit appellant to cross-examine Peggy Pitcher concerning what she had been told about double-dating by her husband and appellant. The offer of proof on this point indicates an obvious effort to prove Peggy Pitcher's bias against appellant. Under offer of proof, Mrs. Pitcher denied that she knew anything about her husband and appellant double-dating with one Alice Cannon and the decedent Judy Evans. We hold that the trial court was in the proper exercise of its discretion in limiting the scope of cross-examination of Peggy Pitcher as to what had been told her about double-dating.

## POINT V

We find no merit in appellant's fifth point. There was no objection to Latham's testimony that he was present when the appellant drew a ring off decedent's finger and when appellant subsequently wrapped the ring in masking tape and buried it at the end of a bridge near Corning. Appellant concedes that a picture of Latham, offered in evidence and depicting him showing C. I. D. men where the ring was buried, was not objectionable because its reception would have been harmless, *absent the testimony* to which the appellant does object. Latham's testimony to which appellant objects appears as follows:

"Q. Where did Ray Glover wrap the ring up in that?

A. At his body shop.

Q. What did he do with the little package?

A. Put it in his pocket.

Q. Did you ever see it again after that?

A. I don't recall seeing it again.

Q. Did you see what Ray did with it?

A. I saw him bury it at the bridge up this side of Corning.

Q. I show you here a picture, ask you to examine it?

A. Picture taken of me up at the bridge this side of Corning where I was showing the C. I. D. men where the ring was buried.

Q. Was the ring recovered there?

A. Yes. It was.

Mr. Pearson: · Offer it in evidence.

Mr. Howard: I object. Extrajudicial statements made by one of the conspirators after confirmation of the conspiracy, improper.

THE COURT: Objection overruled.

Mr. Howard: Exception.

I further object on the ground of hearsay. And the defendant has the right to face the accuser, and, according to the testimony here, done outside the presence of the defendant.

THE COURT: Objection overruled.

Mr. Howard: Exception."

We do not follow appellant's reasoning in connection with his objection to this testimony, as we do not consider the testimony of Latham as constituting "acts and declarations after the termination of the conspiracy." Latham simply testified as to what he himself saw and did.

## POINT VII

In appellant's ·seventh and last point, we find no error in the trial court's refusal to give appellant's requested Instruction No. 1, which was:

"In determining the truth on any issue involved in this case, mere numbers of witnesses should not be the sole criteria of your determination. Rather, you should consider the credibility or lack of credibility of the respective witnesses and the number of witnesses called to establish an alleged fact should be considered by you solely and alone in the light of probability or improbability as to

the alleged fact to which the witnesses may have testified."

Its content was sufficiently covered by other instructions, especially Instruction No. 14, as follows:

"You are the sole judges of the evidence in the case and of the weight thereof, and of the credibility of the witnesses, and in arriving at a conclusion as to what weight you shall attach to the evidence of any particular witness, you will take into consideration his or her interest in the result of the case, his or her conduct, demeanor and manner while testifying as a witness upon the stand, his or her means of ascertaining the knowing the truth of the facts concerning which he or she testified. If you find that a witness has sworn falsely as to any material point is issue, you may entirely disregard the testimony of such witness only if you believe all of his or her testimony to be false, or you may give regard to that part which you believe to be true and disregard that part which you may believe to be false. You have no right to disregard any statement you believe to be true simply because he or she may have sworn falsely as to some other fact."

For the reasons stated in Point II, this matter is reversed and remanded.

HARRIS, C. J. AND JONES, J. dissenting.

FOGLEMAN, J. not participating.

J. FRED JONES, Justice, dissenting. I am unable to agree with the results reached by the majority in this case and I respectfully dissent for two reasons. In the first place, I find nothing in the record before us nor in the decision of the United States Supreme Court in *Irvin* v. *Dowd,* 366 U. S. 717, 6 L. Ed. 2d 751, cited and relied on by the majority, which should make the case at bar immune to the rules this court followed long

before the United States Supreme Court ever heard of the Indiana case of *Irvin* v. *Dowd.*

In the second place, the appellant was not tried by any juror he challenged for cause. In effect, the appellant contends that had he not wasted four of his peremptory challenges on prospective jurors who should have been excused under his challenges for cause, he would have exercised a peremptory challenge on a Mr. Burns who sat on the jury but *who was not challenged by the appellant for cause.*

Judy Evans was twenty years of age when the charred remains of her still smouldering body were discovered on the floor of her parents' 1966 Pontiac automobile which was found burning in a gravel pit off a county road in Greene County, Arkansas. Automobile tire and human footprints, together with the position of the automobile and other evidence surrounding the scene, even prior to autopsy, made it perfectly clear that Judy did not die as a result of her own negligence in the operation of her automobile, as someone had obviously attempted to make it appear. The physical evidence, even prior to the multiple skull fractures revealed on autopsy, pointed unmistakenly to a stupid and thinly veiled effort to submerge the crime of murder in a crime of arson, and to destory all evidence of the former by cremation aided by an ample supply of gasoline generously applied. James Allen Latham and Clyde Ray Glover were soon apprehended and charged with the crime of murdering Judy Evans.

From the record before us the above facts are all that any prospective juror knew, or could have known, prior to the trial of this case. At the trial, Latham admitted his part in the murder and explained in gruesome detail how Glover felt that Judy knew too much about automobile thefts, as well as house burglaries and arson in which Glover and others, including the witness, were involved. Latham explained in detail how he and Glover used a revolving red light to apprehend and stop Judy on the highway; how Glover

drove Judy's automobile to a little used road while he followed in the automobile he and Glover were using; how Glover started "pecking" at Judy in her automobile and how Judy ran to the automobile occupied by Latham and sought his protection against Glover, whom she erroneously thought to be drunk. Latham then gave a blow by blow description of how Glover beat Judy unconscious with his fist and how when she revived, he beat her head with an automobile bumper jack until they thought she was dead; how then, when they noticed that her heart was still beating, Glover pulled her head over by her hair and beat her head some more with the bumper jack, remarking at the time that it didn't bother him a bit. Latham explained how he, at Glover's request, went for the four gallons of gasoline he had purchased several days before for the purpose of cleaning an automobile part. Latham explained how they placed Judy's body upright in the automobile with her foot on the accelerator; how they then accelerated the automobile into the gravel pit; how they saturated the automobile and Judy's body with gasoline and how Glover ignited the gasoline. He related in minute detail how he and Glover disposed of the loot from Judy's purse. They divided the small change and he chewed the chewing gum. Latham testified as to how he helped Glover clean the blood from Glover's black leather coat. He described how Glover prepared and buried a ring he took from Judy's finger before they set her body on fire, and how he led the officers to the ring where he had seen Glover bury it. Latham attempts to explain his own participation in this crime by asserting his physical fear of Glover, but he denies that his testimony was prompted to any degree at all by his fear of the electric chair. Latham's testimony was fully corroborated by circumstantial evidence and the testimony of other witnesses, including that of Randy Ray Glover, the appellant's own sixteen year old son, who testified that on the day following the ghastly night's work related by Latham, his father casually remarked that they had killed Judy Evans and had missed some money because she had not cashed her pay check. Such was the nature of the

crime committed, and such was the nature of the testimony offered by the state.

The appellant heard all of the testimony offered against him by the state in grisly detail and he failed to deny that he said and did everything the state's witnesses testified that he said and did. The burden was on the state to prove that Glover was guilty as charged and, of course, Glover was well within his rights in not testifying in his own defense. In failing to testify, or offer any other evidence to contradict the testimony of the state's witnesses however, the appellant leaves the state's evidence uncontradicted and unimpeached except as to such lack of credibility that may attend the casual commission of such a ghoulish crime by individuals who claim all the rights and privileges of civilized men; and such lack of credibility that may attend the testimony of an admitted thief and accessory to such crime.

Unlike the case of *Irvin* v. *Dowd,* supra, relied on by the majority, there is no evidence that any of the jurors, or any of the prospective jurors, heard anything at all about the details of Judy's murder until they heard it from the witnesses at the trial of the case. In so far as the record reveals, all they knew or could have known, was that Judy had been *murdered* and her body burned in her automobile; but the *record* does not reveal that they even knew she had been murdered. Unlike *Irvin* v. *Dowd,* the record is silent in the case at bar as to what was published in the newspapers from which the jurors could have formed opinions.

I fully agree with Glover and the majority of this court that Glover was entitled to a fair and impartial trial, but I do not agree with Glover and the majority of this court that Glover did not receive a fair and impartial trial. Glover contends, and the majority agrees, that the trial court erred in overruling appellant's challenges for cause to the talesmen Ralph Shoe, Lynn T. Boyd, Wayne L. Britewell, and Alvin Jackson White. Each of these gentlemen stated on voir dire

that they had formed opinions as to the guilt or innocence of the appellant by reading newspapers and hearing the case discussed by people in general, none of whom were witnesses or purported to actually know anything about the case. The news articles and the substance of general discussion are not in the record, but under questioning by the court these gentlemen stated that they could and would lay aside the opinions they had formed and render their verdict according to the law as instructed by the court and the evidence as presented at the trial. Under examination by appellant's counsel, these prospective jurors stated that it would take some evidence to change the opinion they had formed. They were not asked, nor did they state, what their opinions were; *neither did they sit on the jury before whom the appellant was tried.* These jurors were summarily discharged by the appellant through the exercise of his peremptory challenges.

The appellant's actual contention, therefore, is that the trial court committed prejudicial error by causing him to waste four of his twelve peremptory challenges on talesmen who should have been discharged for cause. This contention is ingeniously conceived and expertly presented; it has apparently impressed the majority of this court. The majority points out that the appellant caused the record to show that if he had not been required to exhaust his peremptory challenges on the four talesmen, he would have peremptorily challenged talesman Burns who did sit on the jury. It appears to me that if the appellant had been as concerned with the qualifications of juror Burns, as he now appears, he would have at least challenged Burns for cause, if he felt that Burns was not qualified, instead of asking for additional peremptory challenges which the law *does not,* and the court *can not,* give.

In *Rowe* v. *State,* 224 Ark. 671, 275 S. W. 2d 887, the first eight assignments of error related to the court's action in permitting jurors to serve when, from the defendant's point of view, the answers given on their voir dire disclosed prejudice, fixed opinion as

to the defendant's guilt, or were in some position or relationship calculated to influence jury action irrespective of the evidence. In passing on the "fixed opinion" assignment in that case, this court said:

"While it is true that some of the veniremen said that they had formed tentative opinions based upon newspaper reports or what some one had told them, all who were accepted stated that they could and would be guided solely by the testimony, giving to the defendant the benefit of all doubts that the law defines. There was no error in accepting these men. It is no longer practicable in an intelligent society to select jurors from a psychological vacuum or from a stratum where information common to the community as a whole is lacking."

In *Leggett* v. *State,* 227 Ark. 393, 299 S. W. 2d 59, the crime, as in the case at bar, was a sensational one. The assignment of error relating to the selection of the jury was so near on all fours with the case at bar, I feel justified in quoting fully from our opinion in that case on the point involved, as follows:

"It is apparent from the record that news about the crime and its investigation had been extensively reported in the press and by radio and television. Many veniremen who had formed opinions on the basis of such reports were excused by the court, but the appellant insists that four jurors whom he challenged for cause should also have been rejected. Each of these four men stated in substance that he had formed an opinion about the case and that evidence would be required to remove his opinion, but upon further questioning each man also declared he could lay aside his preconceived view and try the case impartially upon the law and the evidence.

It is settled by many decisions that a tentative opinion of this kind, based upon newspaper reports and the like, does not disqualify a prospec-

tive juror. The appellant relies chiefly upon the early case of *Polk* v. *State*, 45 Ark. 165, but that decision was disapproved in *Hardin* v. *State*, 66 Ark. 53, 48 S. W. 904, and has not been followed in any later case. *Sneed* v. *State*, 143 Ark. 178, 219 S. W. 1019; *Howell* v. *State*, 220 Ark. 278, 247 S. W. 2d 952.''

In the case of *Howell* v. *State*, 220 Ark. 278, 247 S. W. 2d 952, error was assigned in the court's refusal to dismiss on voir dire examination one L. L. Mack as one of the jurors, and particularly in view of the fact that all peremptory challenges were exhausted by appellant before the full jury was finally selected. Mr. Mack was asked and answered questions in that case as follows:

" 'Q. Mr. Mack, do you have such an opinion on your mind at this time as would take evidence to overcome it?

A. Yes, sir, I don't know if the State supports what I have read of the thing, I have that opinion if that is true now. I am open minded on what the newspaper reported, but I have formed an opinion from that.

Q. Could you, and would you go into the trial of this matter with an open mind and discharge any preconceived notion or opinion and render your verdict on the facts and circumstances developed in evidence, applying the law given by the court, could you render a verdict and disregard any idea you might have?

A. I think I could.

Q. Would you say you know you could?

A. Yes, if the evidence warrants it.'

Counsel for appellant asked:

'Q. Are you telling this court that you at the present time have an opinion on your mind?

A. Based on newspaper reports.

Q. And that opinion would take evidence on the part of the defendant to remove it from your mind?

A. I wouldn't say that. I would say if the State presents evidence as outlined by the press and other things, it would take some other evidence to disprove that, I don't know what the State is going to show.'

The Court then asked:

'Q. In other words, it would be what the State develops the evidence?

A. Yes, sir.

Q. You could go into the jury box with a free and open mind?

A. I don't see how I could keep from forming an opinion if the facts are as reported by the press.

Q. But still you are open to discharge that from your mind and render a verdict as the State presents its case, also taking into consideration all the evidence, which would include the defense, you could do that?

A. Yes, sir.' "

In that case this court said:

"It was not error for the court to refuse to dismiss the juror for cause under the many decisions of this court, such as: *Dolan* v. *State,* 40 Ark. 454; *Daughtry* v. *State,* 80 Ark. 13, 96 S. W. 748; *Dewein* v. *State,* 114 Ark. 472, 170 S. W. 582; and *Borland* v. *State,* 158 Ark. 37, 249 S. W. 591."

Presumptions may attend the source of information from which a juror may form an opinion as was clearly set out in the case of *Rush* v. *State,* 238 Ark. 149, 379 S. W. 2d 29. In that case Fred Rush was being tried for the murder of his stepfather, Paul Rush, who owned and operated a furniture company in Fort Smith. On voir dire examination one of the veniremen stated that he rented a building to the furniture company' and had discussed the case with an employee of the company *who was also listed as a witness in the case,* and that he (the venireman) had an opinion which would take evidence to remove. He also stated that he could set aside his opinion and try the case on the law and on the evidence introduced at the trial. The defendant challenged the qualification of the venireman but the trial court held that he was qualified. In holding that the trial court erred, this court distinguished between opinions formed by reading newspaper accounts and hearing the case discussed generally, and opinions formed as a result of discussing the case with a prospective witness, in the following language:

"In numerous cases this court has held that although a venireman has formed an opinion, from rumor and the reading of newspapers, that would take evidence to remove, he is qualified if he can go into the jury box and give both the State and the defendant a fair and impartial trial and base his verdict on the evidence introduced in the case and instructions of the court. *Hardin* v. *State,* 66 Ark. 53, 48 S. W. 904; *Ham* v. *State,* 179 Ark. 20, 13 S. W. 2d 805; *West* v. *State,* 150 Ark. 555, 234 S. W. 997; *Niven* v. *State,* 190 Ark. 514, 80 S. W. 2d 644. There it was pointed out that the veniremen had not talked with any witness; *Howell* v.

*State,* 220 Ark. 278, 247 S. W. 2d 952; *Leggett* v. *State,* 227 Ark. 393, 299 S. W. 2d 59. In *Lauderdale* v. *State,* 233 Ark. 96, 342 S. W. 2d 422, it was pointed out that the venireman had not talked to a witness.

But we have been cited to no case, and we have found none, holding that one is qualified to serve on a jury who has talked with a witness in the case and has formed an opinion that would take evidence to remove. We have at least two cases holding to the contrary. *Caldwell* v. *State,* 69 Ark. 322, 63 S. W. 59; *Lane* v. *State,* 168 Ark. 528, 270 S. W. 974. The court erred in holding the venireman, Laws, to be qualified to serve as a juror."

As we said in *Stout* v. *State,* 247 Ark., 948, 448 S. W. 2d 636, and later in *Pointer* v. *State,* 248 Ark. 710, 454 S. W. 2d 91, an accused does not have the right to have a jury of his choice from the panel selected, but an accused only has the right to a competent, fair and impartial jury. As stated in *Stout,* the privilege of peremptory challenge in selecting a jury is not a *right of selection,* it is a privilege of *rejection.* 47 Am. Jur. 2d, Jury, § 233.

I recognize, as I think everyone must, that intelligent inquiring minds acquire ideas and form opinions from what is read and heard, and that practically every law-abiding citizen is prejudiced to varying degrees against crime and criminals. Consequently, in the selection of a jury to try a criminal case, the important question is not so much whether a juror has formed an opinion or is prejudiced; the important question is whether the citizen, when carrying out his duties as a juror, can lay aside his opinions and prejudices and give the accused a fair trial. An accused is not entitled to a trial before a jury of robots, he is entitled to a trial before honest jurors who are intelligent enough to recognize their own opinions and prejudices and honest enough to say so if they are unable to fairly and impartially try the accused.

I feel that the majority have overreacted to the United States Supreme Court decision in *Irvin v. Dowd,* supra, and have let the results reached by the court on the facts in that case stand as a solemn mandate and rigid rule of law to be applied and followed in the case at bar under an entirely different set of facts. In other words, it appears to me that the majority are reading more into the decision in *Irvin v. Dowd,* than I am able to read out of it. In the *Irvin* case it is perfectly clear that the news media had fanned the flames of normal prejudice against crime and criminals to the point where mere opinions were converted into fixed and established facts, and reason was consumed, lost or abandoned in the process; even the reason of prospective jurors. In other words, the newspapers had successfully kindled a fire of public opinion against Irvin and then fanned and fed the flame until no amount of cold reason could cool its searing effect, and nothing less than the life of Irvin could extinguish it. Such was the situation in the *Irvin* case, but such was not the situation in the case at bar.

As I view the decision in the *Irvin* case, it is actually a scorching, and well deserved indictment of the news media, aided and abetted by a sheriff and a prosecuting attorney, in pre-trying Irvin to the extent that he stood convicted before trial, not only for the crimes with which he was charged in Indiana, but for all the crimes and misdemeanors ever committed by him or of which he was ever accused. The syllabus alone in *Irvin v. Dowd,* sets it poles apart from the case at bar for it contains the following statement:

"At the trial, the jury panel consisted of 430 persons; 268 of these were excused for cause as having fixed opinions as to the guilt of petitioner; and *8 of the 12 who finally served on the jury admitted that they thought petitioner was guilty,* but each indicated that, notwithstanding his opinion, he could render an impartial verdict." (Emphasis added).

Irvin was accused of murdering six people; he was tried and convicted in Indiana and his case reached the United States Supreme Court by certiorari. The build up of prejudice through the newspapers in *Irvin* v. *Dowd,* went much further than the average person would conceive that responsible news media would go. As pointed out by Mr. Justice Clark, it was alleged, in the motion for a new trial, that curbstone opinions were solicited and recorded by the newspapers on the public streets and not only as to the appellant's guilt, but even to what punishment he should receive. A barrage of newspaper headlines, articles, cartoons and pictures were unleashed against the appellant during six or seven months preceding his trial. The news stories revealed the details of the appellant's background including reference to crimes committed when he was a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police lineup identification; that he faced a lie detector test, had been placed at the scene of the crime, and that the six murders were solved but petitioner refused to confess. The newspapers later announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99-year sentence, but also the determination on the other hand of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the *modus operandi* of these robberies was compared to that of the murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing petitioner's execution by the state of Kentucky, where the petitioner was alleged to have committed one of the six murders, if Indiana failed to do so. Another article characterized petitioner as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories petitioner was described as "the confessed slayer of six," a parole violator and fraudulent-check artist. Petitioner's court-appointed

counsel was quoted as having received "much criticism over being Irvin's counsel" and it was pointed out, by way of excusing the attorney, that he would be subject to disbarment should he refuse to represent Irvin. *On the day before the trial* the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in the case) as well as "the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Kentucky." On the second day of Irvin's trial, which was devoted to the selection of the jury, the newspapers reported that "strong feelings, often bitter and angry, rumbled to the surface," and that "the extent to which the multiple murders—three in one family —have aroused feelings throughout the area was emphasized Friday when 27 of the 35 prospective jurors questioned, were excused for holding biased pretrial opinions. . ." A few days later the feelings were described as "a pattern of deep and bitter prejudice against the former pipe fitter." Spectator comments, as printed by the newspapers, were "my mind is made up"; "I think he is guilty"; and "he should be hanged."

The news reporting in *Irvin* v. *Dowd* was almost as revolting as the crime itself in the case at bar, and certainly I have no quarrel with the result reached in *Irvin* under the facts of that case. In Irvin we have only the facts as reported through the news media, and in the case at bar we have only the facts as testified by witnesses at the trial of the case. An additional important distinction stands out in *Irvin* in the following language:

> "An examination of the 2,783 page voir dire record shows that 370 prospective jurors or almost 90% of those examined on the point (10 members of the panel were never asked whether or not they had any opinion) entertained some opinion as to guilt —ranging in intensity from mere suspicion to absolute certainty. A number admitted that, if they were in the accused's place in the dock and he in

theirs on the jury with their opinions, they would not want him on a jury."

The important and decisive point in *Irvin* v. *Dowd*, as well as further distinction from the case at bar, is stated in *Irvin* v. *Dowd*, as follows:

"Here the 'pattern of deep and bitter prejudice' shown to be present throughout the community, cf. *Stroble* v. *California*, 343 U. S. 181, was clearly reflected in the sum total of the voir dire examination of a majority of the jurors placed in the jury box. Eight out of the 12 thought petitioner was guilty. . . . Where one's life is at stake—and accounting for the frailties of human nature—we can only say that *in the light of the circumstances here* the finding of impartiality does not meet constitutional standards. Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief. One said that he 'could not . . . give the defendant the benefit of the doubt that he is innocent.' Another stated that he had a 'somewhat' certain fixed opinion as to petitioner's guilt. No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the phychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." (Emphasis added).

In my opinion the court in *Irvin* v. *Dowd*, indicates it would probably have reached a different result had the facts in that case been such as we have in the case at bar. Quoting from *Reynolds* v. *United States*, 98 U. S. 145, 155, the court in *Irvin* v. *Dowd*, states:

"It is not required, however, that the jurors be

totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.

This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies* v. *Illinois,* 123 U. S. 131; *Holt* v. *United States,* 218 U. S. 245; *Reynolds* v. *United States,* supra.

The adoption of such a rule, however, 'cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.' *Lisenba* v. *California,* 314 U. S. 219, 236. As stated in *Reynolds,* the test is 'whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. The question thus presented is one of mixed law and fact. . .' At p. 156. 'The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside. . . If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed.' At p. 157. As was stated in *Brown* v. *Allen,* 344 U. S. 443, 507, the 'so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.' It was, therefore, the duty of the Court

of Appeals to independently evaluate the *voir dire* testimony of the impaneled jurors."

I fail to find authority, or even a suggestion in *Irvin* v. *Dowd*, that would justify us, on the facts in the case at bar, in abandoning the procedure we have followed in our own cases, supra, and adopting as a procedural rule of law, the *results* reached by the United States Supreme Court on the bizarre facts of an Indiana case completely different and foreign to the facts in the case at bar. I would continue to follow the rules we have heretofore followed, and continue to inquire *in each given case*, whether the application of the rule works a deprivation of the prisoner's life or liberty without due process of law. In the case at bar, I am convinced that it did not.

I would affirm the trial court on all points.