Ruby Helen CHARLESTON *v.* STATE of Arkansas

CR 74-65                                       514 S.W. 2d 209

Opinion delivered September 23, 1974
[Rehearing denied October 28, 1974.]

*Harold Hall,* Public Defender, by: *John W. Achor,* Dep. Public Defender, for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *O. H. Hargraves,* Dep. Atty. Gen., for appellee.

J. FRED JONES, Justice. The appellant, Ruby Helen Charleston, was charged on information with voluntary manslaughter in the killing of her paramour, James Singleton, with whom she lived as his wife and by whom she had one child. At a trial before the circuit judge, sitting as a jury, she was convicted of the charge and was sentenced to two years in the penitentiary with one-third of the time to be served before parole. On appeal to this court the appellant contends that the trial court erred in admitting statements made by the appellant into evidence, and also contends that the evidence is insufficient to sustain the conviction. We do not agree with either contention.

The appellant and the decedent lived in Little Rock and in addition to their own child, the appellant had two other children who lived in the home. The appellant was the only witness who testified as to her and James' activities on the night of his death. She gave three contradictory statements to the police officers and also testified at the trial, and the facts upon which all versions agree appear as follows:

On the night of James' death he and the appellant had gone to some place in or near the town of Scott where the appellant drank some beer and danced with one of the male patrons who was a stranger to them. James voiced objections to the appellant as to the manner in which she danced with the other man. The appellant carried James' .22 caliber revolver in her purse and on their return trip to their home in Little Rock, they both were angry and the appellant refused to talk to James. After arriving at their home in Little Rock, they continued to quarrel over the incident at Scott. James accused the appellant of dancing closer to the other man than she did with him and suggested that if she cared so much for the other man that she go to him, and the appellant responded that she might just do that. The appellant said that upon their return home from Scott, she went directly to the bathroom and James followed her. She said James jerked her up off the commode and then shoved her back down on it. Following the bathroom incident the appellant's versions differ as to what took place until she called James' sister by phone and stated that James had shot himself.

When James' sister, father and the officers arrived, James was lying on his back in bed with his trousers on and with a fatal gunshot wound high on his forehead slightly on the left side. The evidence was to the effect that the course of the bullet was straight into the head and that both the appellant and James had metal tracings on their hands consistent with having handled the gun.

The appellant gave one oral and two written statements in her own handwriting to the police officers and she testified at the trial. The trial court held that her statements were voluntarily made and they were accepted in evidence. The appellant first told the officers that James asked her if she believed he loved her more than he did his parents and when she answered in the negative, he inquired if she believed he would shoot himself over her and the children and when she answered in the negative, he shot himself.

The appellant then gave a written statement in which she said that after the incident in the bathroom, James asked for his gun and she gave it to him. She said James then struck her with a belt; that she attempted to take the gun away from him and it discharged.

In the second written statement the appellant said that after the bathroom incident, she "got smart" with James and he got a belt and started beating her. She said he had done that before and she was getting tired of it. She said she got the gun with the intention of making him stop beating her; that he attempted to take the gun from her and it discharged. She said she didn't intend to kill James but that she did it.

The appellant testified that after the bathroom incident, she had gone to the bedroom and had lain down on the bed when James came into the bedroom. She said he *undressed* and went to bed. She said James then told her he loved her more than he did his parents and she told him he was lying. She said she had taken the gun from her purse and placed it under her pillow. She said James then asked her if she believed he would kill himself over her and the children. She said when she answered in the negative, he started begging for the gun. She said she was lying with her back to James and she finally took the gun from under her pillow and threw it over to him. She said she then heard the gun discharge.

> ". . . [T]he gun was under my pillow, and he kept asking me for his gun and I told him I wasn't going to give him anything. And, so, he kept begging and begging, and I had my back to him and I just throwed the gun over to him, and the next thing he asked me, 'You don't believe I really love you and the kids more than I do my father and mother?' and I told him no. And then he said, 'You don't believe I'll kill myself over you and them kids?', and I said no. The next thing I heard the gun go off."

The appellant testified that before undergoing the trace metal test the officers told her that if gunpowder markings were found on her hands, she would be sent to the penitentiary for life.

> "The tall detective, he told me, he said, 'If we find gunpowders on your hand, I'll see you in the penitentiary the rest of your life."

The appellant said that because of this statement by the detective she became "scared" and gave the written statements. After testifying that James committed suicide as above set out, the appellant then testified as follows:

"Q. Now, Ruby, is that the first story you told the detective that was in here?

A. Yes.

Q. What did he say?

A. He said, he told me like this. He said, 'I just can't believe that. If we find gunprints on your hand, that's all there is to it.'

Q. What else did he say, that's all there is to it?

A. He meant that he would see me—he would·send me to the penitentiary for the rest of my life.

Q. Why did you give that second statement, Ruby?

A. Because I was scared.

Q. Why did you write it out?

A. I didn't know what else to do.

*　*　*

Q. Now, even after you gave that statement, you gave another one?

A. Yes.

Q. Why did you do that?

A. Because they keep asking me questions and questions over again, and I was scared, and I just didn't know what else to tell them."

James' father, Alexander Singleton, testified that when he arrived at his son's house, the appellant was hugging James' body and was crying. He said he heard her say, "James I didn't intend to do this." Detective Plummer testified that after the appellant finished writing her second statement, she acted out the occurrence. In this connection he testified as follows:

"She explained to me at the time, this is after she had written the last statement, that she was on the bed and sitting in the middle of the bed, had this weapon in her left hand, and Mr. Singleton was standing at the foot of the bed, or either with his knees on the bed, and had his hand on the gun trying to take it from her when it went off. She acted this out for me. In other words, exhibited, you know, what had occurred."

In both of the appellant's handwritten statements she stated that no threats or promises had been made to get her to give the statements. While the appellant's statements were certainly conflicting, it is really not seriously contended they were coerced by the officers or not voluntarily made. We agree with the trial court that the statements were admissible in evidence.

In 22A C.J.S. § 732, at page 1049, is found the following statement:

"The state of mind which renders a statement involuntary is that induced by mistreatment, threats, promises, or physical or mental abuse which deprives an otherwise rational mind of the exercise of its free will and powers of decision and discernment; it is not that mental condition which arises from an inner sense of wrongdoing and fear of its consequences."

The appellant argues that in determining the voluntariness of a confession, the court should look to the whole situation and surroundings of the accused and the appellant cites *Dewein* v. *State,* 114 Ark. 472, 170 S.W. 582, but in that case we also said:

"In order to render a confession involuntary there must be some threat or inducement held out to overcome his will."

The appellant admitted that the officers explained her constitutional rights to her and she so states in her handwritten statements. She also testified that the officers were real nice to her. The trial judge sitting as a jury could have reasonably concluded that the statement the appellant said the officers

made to her, prior to making the metal tracing test, prompted her to offer some reasonable explanation for gunpowder she had reason to believe might be found upon her hands. Her first written statement was to the effect that she was attempting to take the gun away from James when it discharged and apparently after further questioning, she admitted that she held the gun and that it discharged when James attempted to take it away from her. We are of the opinion that the statements the appellant gave the officers fell far short of being induced by mistreatment, threats, promises, or physical or mental abuse, and that the statements were voluntarily given.

Manslaughter is defined as the unlawful killing of a human being, without malice express or implied, and without deliberation. Ark. Stat. Ann. §§ 41-2207 and 41-2208 (Repl. 1964) define voluntary manslaughter as follows:

"Manslaughter is the unlawful killing of a human being, without malice express or implied, and without deliberation.

Manslaughter must be voluntary, upon a sudden heat of passion, caused by a provocation, apparently sufficient to make the passion irresistible."

The appellant testified that James undressed and went to bed and then committed suicide after she finally gave him the pistol in compliance with his repeated requests. James had his trousers on when the officers arrived on the scene and we are of the opinion that the evidence was sufficient to support the conviction for voluntary manslaughter in this case.

Affirmed.